T. W. JEFFERSON, Guardian of S. S. JEFFERSON, Appellee,
v. G. L. RUST, Appellant.

**Cancellation of instruments:** PLEADINGS: LACHES. A plea of laches is a logical and permissible defense to an action to set aside a deed for fraud and undue influence.

**Pleadings:** PENDENCY OF AN ACTION. The plea of another action pending is one in abatement and not in bar, and in no manner involves an election of remedies or an estoppel.

**Cancellation of instruments:** MENTAL INCOMPETENCY: UNDUE INFLU- ENCE. Where an undue advantage has been taken of the weakness of mind and want of judgment of a grantor for the purpose of depriving him of his property equity will grant relief, even though neither actual fraud nor technical duress is shown.

In this action the evidence is held to show that the defendant obtained a conveyance of the property of his son-in-law, who was weak minded, for an inadequate consideration and by the exercise of undue influence, such as authorizes a cancellation of the conveyance.

**Same:** LACHES. Imbecility and mental weakness are an excuse for delay in bringing an action to set aside a conveyance obtained because of undue influence over an incompetent grantor; and even though a guardian may have known the facts long prior to his appointment this would not affect his conduct thereafter, and where he acted with promptness in bringing suit, as in this case, the defense of laches is not available.

**Same:** TENDER. A grantee who has obtained a conveyance from an incompetent, knowing of his incompetency, and who by his own acts has rendered it impossible for the grantor to place him *in statu quo* can not insist in an action to set aside the conveyance that the grantor tender back what he has received. In this action, however, nothing is shown to have been left in the grantor's hands to be tendered back.

**Actions:** ABATEMENT. A plea of another action pending is not sustained where the issues involved in the two suits are not the same.

**Cancellation of instruments:** PAYMENT OF MORTGAGE. Where, as in this case, the defendant obtained title to property by undue influence over an incompetent grantor and subsequently incumbered the property, for which he became personally liable, the court on cancelling the conveyance without requiring the grantor to make any return to the grantee should have provided that the land stand as the primary fund for the payment of the mortgage.

*Appeal from Pottawattamie District Court.*—HON. W. R. GREEN, Judge.

FRIDAY, DECEMBER 16, 1910.

SUIT in equity to cancel a conveyance of certain lands, for a decree finding plaintiff to be the absolute owner of the premises and for other equitable relief. Defendant filed a general denial and pleaded other defenses which will be noticed in the body of the opinion. Decree for plaintiff, and defendant appeals.—*Modified* and *affirmed.*

*Ira B. Stitt, A. B. Johns, Frank Shinn,* and *Dudley & Coffin,* for appellant.

*Turner & Cullison,* for appellee.

Deemer, C. J.—Plaintiff was appointed guardian of the person and property of one S. S. Jefferson as a person of unsound mind in October of the year 1907, and as such guardian he commenced this action on November 28, 1907, which action is to set aside a conveyance of two hundred and thirty-three and one-half acres of land made by the ward, S. S. Jefferson, his then wife, now deceased, joining therein, to the defendant, the conveyance bearing date December 29, 1900. In the petition it is alleged

That S. S. Jefferson was, on and prior to December 29, 1900, of such weak and unsound mind as to incapacitate him from making or entering into a contract; that he was incapacitated from understanding the nature, effect, and consequences of his acts in business matters; that he had no knowledge or judgment of the value of property, and was incapable of exercising any, all of which was known to, or should have been known to, the defendant; that, after his marriage to the daughter of defendant, defendant exercised such undue influence over him that for the purpose of cheating and defrauding him he induced and coerced him to convey to him (defendant) the lands which he owned, for which lands he (Jefferson) accepted the land owned by defendant and two promissory notes aggregating $4,675, one of which for $3,000 defendant has paid, and no more; that the land was conveyed by defendant to his daughter, then the wife of the ward, and the notes were made payable to her; that the ward did not understand the nature and effect of these transactions; and that said act was not his own voluntary act, but was the result of the undue influence of defendant. It is further alleged that Clara A. Jefferson, wife of the ward, died childless and intestate, having the record title of the real estate conveyed to her and the holder of the notes for $3,000; that the mother of Clara A. Jefferson was de-

ceased at the time; and that defendant claimed to be the owner of an undivided one-half of the real estate conveyed to her by defendant and one-half of the personal estate of the decedent upon distribution; but that in fact the property was really that of the ward and did not belong to said Clara A. Jefferson. It is further alleged that the rental value of the land conveyed by the ward to defendant was $900 per year, and for this defendant is liable to appellee, and that the consideration given by defendant for the land of the ward was grossly inadequate, and that the ward has, because of his weakness and unsoundness of mind, and the coercion of the defendant in securing the conveyance from him, and the defendant's conveyance to the said Clara A. Jefferson, and by reason of the grossly inadequate consideration for the property of S. S. Jefferson, the said S. S. Jefferson has been grossly and wickedly cheated and defrauded by the defendant.

Defendant denied practically all the material allegations of this petition, and, as there is some controversy as to the exact issues tendered, we here quote from the answer the following:

Par. 6. That at the time of purchasing two hundred and thirty-three acres of land from S. S. Jefferson defendant had no notice or knowledge that the said S. S. Jefferson was of unsound mind, and there was nothing in his acts or demeanor that would put defendant or any person upon inquiry as to his condition.

Par. 7. That there is another action pending commenced by S. S. Jefferson against this defendant, which action was begun December 18, 1906, in which S. S. Jefferson is seeking to recover an alleged balance due on the said purchase price of said two hundred and thirty-three acres of land and the plaintiff herein has been substituted as plaintiff in that case.

Par. 8. That this action is not brought in good faith, but for the purpose of hindering and obstructing defendant in the free use and enjoyment of his property and for the purpose of putting him to expense in defending these cases, and plaintiff has not offered nor attempted to place the defendant in *statu quo,* and defendant alleges that the

parties to this suit can not be placed in *statu quo,* and the contract between the parties has been fully executed for more than seven years.

Upon the foregoing issues and the testimony adduced in support thereof there was a decree for plainitiff as prayed; but the claim for rents and for an accounting was dismissed by plaintiff without prejudice before the submission of the case to the court. The decree canceled the conveyance, decreed that plaintiff was the owner of the land, and found that he was entitled to the possession thereof. Defendant was ordered to reconvey, and an execution to put plaintiff in possession of the premises was ordered. Counsel for defendant present many reasons why the decree should be reversed, some of which were presented to the trial court, and some seem to be an afterthought, for they were evidently not relied upon until the case reached this court upon appeal. To some of the latter we shall first turn our attention.

I. Defendant contends that plaintiff's action is barred by the statute of limitations. It is more than doubtful if this defense is pleaded. The only reference to the matter is found in paragraph 8 of the answer, before quoted, and that does not appear to plead the statutes of limitations. It was doubtless intended as a plea of laches; and as the action is in one sense at least, for the recovery of real property, this is a logical and permissible defense; but it is something different from the statute of limitations. But if it amounts to a plea of the statute the sufficiency of the plea rests at last upon the question of fact as to whether the ward was unsound of mind at all times after the cause of action arose. By section 3453 of the Code the statute of limitations is extended in favor of insane persons so that they shall have one year after the termination of their disability within which to commence action. And by section 48, subdivision 6, of the Code, the words "in-

1. CANCELLATION OF INSTRUMENTS: pleadings: laches.

sane persons" are defined to be "idiots, lunatics, distracted persons and persons of unsound mind." So that the point, if there be anything in it, finally turns upon the question of fact as to the ward's condition of mind.

II. Another matter relied upon by counsel for defendant is a supposed plea of election of rights or remedies and a claimed estoppel. None of these matters are pleaded in answer. The seventh paragraph of that pleading does set forth another action pending; but this is quite a different matter from an election of rights or remedies or an estoppel. The matter as pleaded is in abatement and not in bar, and this, of course, eliminates other matters.

2. PLEADINGS: pendency of another action.

III. There are really not more than three or four questions in the case, and these are of mixed law and fact. One is: Was the ward of unsound mind at the time he made the conveyance? And closely allied with that is the second question, which is also of fact: Was he coerced into making it, or was it the result of fraud and undue influence? The first of these questions settled, knowledge by defendant of the ward's condition of mind may become material, and, while not essential to a conclusion on the second question, it is undoubtedly a material inquiry. These questions settled, there yet remain three more: (1) Is the plea in abatement good? (2) Is plaintiff entitled to any relief without placing defendant in *statu quo?* (3) Was plaintiff or his ward guilty of such laches as to bar the action?

3. CANCELLATION OF INSTRUMENTS: mental incompetency: undue influence: evidence.

The case is peculiar in its facts, and no one can read the record without being convinced that the ward is not insane in any proper sense. His trouble is congenital and should be termed idiocy, imbecility, or weakness of mind. In other words, he has no delusions or hallucinations; but the testimony for plaintiff is to the effect that he is substandard, or subnormal, as the experts put it, and that

this condition has existed since the ward was fifteen or sixteen years of age. The testimony conclusively shows that plaintiff is weak-minded, childlike, neglectful of his duties to his property and to his neighbors, visionary, lacking in judgment about the simplest of matters, headstrong, although not courageous, unstable in his methods, and unsystematic about everything. The only serious question in the case is the nature and extent of his deficiencies. If the question depended solely and entirely upon the proposition of the ward's insanity or unsoundness of mind, disconnected from defendant's relation with and conduct toward the ward, who is his son-in-law, we should have such doubts of the correctness of the decree entered by the trial court as to be disposed to reverse it. But there is much more in the controversy than this one proposition. Whatever the ward's condition of mind, defendant knew of it, or at least was in a position to know, and that he knew and took advantage of his weakness we have no reason to doubt. After a short, fitful, and unusual courtship lasting but a few months, the ward married one of defendant's daughters, who, although but sixteen years of age, was then enceinte undoubtedly by another man. Within a few months after marriage a child was born, but the ward continued to live with his wife and spoke no word of complaint to any one so far as shown. Defendant declared to his daughter almost simultaneously with the ward's first appearance at defendant's house that this man was to be her husband. After the marriage, and after the birth of the child, defendant was continually stating, in the ward's presence, that he would kill any man who did not take proper care of his daughter. The ward's wife died early in the year 1901, after the conveyance in question was made, seized of the land which defendant says he gave in trade for the ward's property. Before the death of the wife, defendant assaulted the ward upon some trivial pretext, drove him into a house, where he sought

to protect himself by locking a door and crawling under a bed. When the ward was married, he was possessed of the land in controversy, having purchased a part of it from his father, although it is doubtful if he paid anything for it, and the remainder from his mother by will. The latter property was incumbered by a charge in favor of the ward's brothers, to which we shall hereafter refer. The possession of this real estate by the ward was by defendant used as an argument with his daughter in inducing her to marry the ward. At one time defendant declared that he intended to possess himself of all of the property of his son-in-law and leave him helpless. For a short time after the marriage the ward and his wife lived with defendant. This was in the year 1899. In February of the year 1900, the ward leased the premises in controversy to defendant for a cash and grain rental and shortly thereafter moved into the nearby town of Oakland, and defendant immediately went into the possession of the land. It is doubtful, under the record, whether he (defendant) ever paid any of the rent. The trial court was justified in finding that the ward had some corn upon the land at this time which defendant took and never accounted for.

The lease to which we have referred was for two years and did not expire until the year 1902; but in the early part of the winter of 1900 the conveyance in question was made. At that time defendant was the owner of one hundred acres of bottom land, through which ran a river, which was subject to overflow, which land was covered by a mortgage of $2,000. This land was worth from $25 to $30 per acre. He traded this land to the ward for the two hundred and thirty-three acres of land putting it in at $50 per acre, gave two notes aggregating $4,675, and assumed the charge of $1,000 upon the ward's land in favor of the ward's brothers, and claims that he paid $1,000 in cash to the ward. He also claims to have paid the ward at the time of the exchange $950 in

cash for a town property in the town of Oakland, which property is not now in dispute. For this he received a deed for the two hundred and thirty-three acres of land subject to a mortgage of $2,000 and the charge upon the land. As defendant's land was also mortgaged to the same amount, the consideration which defendant paid for the ward's land was $50 per acre, although he greatly overvalued his own and never paid the mortgage thereon, as we understand it. Defendant deeded his land to his daughter, the wife of the ward, and when the daughter died took one-half thereof by inheritance. A note for $1,675 which was a part of the alleged consideration of $4,675 was made to the ward's wife, and defendant claims that the wife gave him this note. Defendant assumed and agreed to pay the charge of $1,000 against the ward's lands which was payable to the ward's two brothers, C. C. and T. W. Jefferson. After the conveyance of the land, these two brothers brought action to set aside the mother's will. This action was settled, defendant being an active factor in the settlement, the ward agreeing to pay his brothers $1,750 instead of $1,000 in installments, and the brothers released their claim and lien upon the land secured by defendant through the conveyance now sought to be set aside. Defendant admits that in virtue of this transaction he would owe the ward $1,000 but for the fact that he used this amount in paying debts of the ward. The ward's brothers obtained judgment against the ward for the amount he agreed to pay upon the settlement of the will contest, and they sold the ward's half interest in the land given by defendant to the ward's wife in exchange for the land now in controversy, which half interest the ward acquired through descent from his wife. They also garnished the administrator of the deceased wife, and something like $500 is now held by the clerk of the court pursuant to the garnishment. Defendant claims that the $4,675 which he agreed to pay in exchange was represented

by two notes, one for $3,000, and the other for $1,675. The latter note we have already referred to. He claims that both notes were made payable to his daughter, and that he paid the $3,000 note to his daughter's administrator, who used the proceeds in paying a note given the Bank of Oakland signed by the ward, his wife, and the defendant, but that this bank note was really the ward's debt. At any rate, the ward individually received no part of the consideration for his land, save that he took by inheritance one-half the land deeded by defendant to the ward's wife, and this was sold under execution to pay at least part of an amount which defendant had agreed to pay. Defendant says that practically all of these things were done with the knowledge and consent, if not by direction, of the ward.

It should also be stated that the land in controversy was incumbered by mortgage in the sum of $2,000 when defendant obtained title thereto, that he has since mortgaged the same, so that there was at the time of the trial $11,000 against it. Not counting interest or the sums said to have been paid out, defendant has received or had the benefit of $9,000 in money, and he has parted with nothing save his title to one hundred acres of land worth approximately $3,000, which was incumbered for $2,000, one-half of which he has back through inheritance from his daughter. It it be assumed that he paid the $3,000 note and $1,000 in cash for the property, and also gave his land the equity in which was not worth to exceed $1,500, he is more than made whole by the money he obtained through mortgages upon the land in controversy. The ward has in no event received anything personally, unless it be that defendant paid some of his debts. The land given by defendant in exchange for the property in controversy was deeded to the ward's wife. The notes were made payable to her, and one of them returned to defendant. Defendant did not pay the charges upon the land which the ward

transferred, but permitted the claims of the brothers to be reduced to judgment, and the one-half of the land deeded to the ward's wife, which the ward finally received by descent, has been sold in part payment of the judgment. Whatever the ward may have received of the money paid by defendant to the administrator of the wife's estate is now being held under garnishment on the judgment obtained by the ward's brothers. That defendant paid any of the ward's debts is very doubtful; but, if he paid all that is claimed, defendant is out nothing by reason of his trade for the land, for he has been fully reimbursed from money received upon the mortgage which he placed upon the property.

We have stated this much of the record to show the nature of the trade and the situation when this suit was commenced for the double purpose of ascertaining whether the conveyance was obtained by fraud or undue influence, and also as to whether the transaction should be set aside because of the ward's weakness of mind coupled with defendant's machinations which resulted in dispossessing the ward of valuable property without adequate consideration or in such a manner as to indicate coercion, covin, or corruption. This recitation also has a direct bearing upon the question as to whether or not defendant should be placed in *statu quo,* and as to whether or not some protection should be given defendant in the event the conveyance is set aside. A careful consideration of the record leads up to the conclusion that defendant took advantage of the ward's weak-mindedness and want of judgment for the purpose of depriving him of his property, and that he has made good his threat to pauperize his son-in-law. Equity will in such cases afford relief, although neither fraud nor technical duress is shown. *Yard v. Yard,* 27 N. J. Eq. 114; *Ranken v. Patton,* 65 Mo. 378; *Whelan v. Whelan,* 3 Cow. (N. Y. Com. L.) 537; Story's Equity, sections 238, 239. The rule is thus stated in Page on Con-

tracts, section 221: "If the party seeking relief is weak mentally, the transaction of which he complains will be scrutinized carefully, and, if any ground for believing that undue influence has been acquired over him exists, the transaction will be set aside." In *Harding v. Handy,* 11 Wheat, 125 (6 L. Ed. 429), Chief Justice Marshall said: "If these deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interpose in such a case is among its best settled principles." The trial judge had the witnesses before him and his conclusions, after hearing and seeing the witnesses, including the ward himself, was that the conveyance was inequitable and unjust, and should be set aside. In this we concur.

IV.   But it is said that plaintiff or his ward have been guilty of such laches that the conveyance should not be set aside. Imbecility, insanity, and weakness of mind are sufficient excuse for such a delay as is here shown, and, even though the plaintiff as guardian may have known of the transaction many years before he was appointed, this does not affect his conduct since his appointment as guardian. After such appointment, he acted with great promptness in bringing the suit. The defense of laches is not available.

4. SAME: laches.

V.   It is said that the conveyance should not be set aside because the parties can not be put in *statu quo* and for the further reason that neither plaintiff nor his ward have tendered back what the ward received from defendant. This quotation from the recent case of *Creveling v. Banta,* 138 Iowa, 47, is applicable to these propositions: "If, therefore, he (the defendant) has so entangled himself in the meshes of his own knavish plot that the party defrauded can not unloose him,

5. SAME: tender.

the fault is his own, and the law only requires the injured party to restore what he had received, and, as far as he can, undo what has been done in the execution of the contract. This is all that the party can do and all that honesty and fair dealing require of him. If this fail to extricate the wrongdoer from the position he has assumed, it is in no sense the fault of his intended victim; and, upon the principles of eternal justice, whatever consequences may follow should rest upon the head of the offender alone." Again, it is fundamental that, if the mental weakness or unsoundness is known to the other contracting party, neither the person laboring under the disability nor his representative is required to do more than tender back what he has left of what the ward received. And if the consideration passed to another no tender is necessary. *Hale v. Kobbert,* 109 Iowa, 128; *Northwestern Co. v. Blankenship,* 94 Ind. 535 (48 Am. Rep. 185). Nothing is shown to have been left in the ward's hands to be tendered back. At the most, he received but $1,000, and it is doubtful if he ever got that much from this land. The entire consideration, save this and perhaps some debts paid by defendant for him, passed to the ward's wife and one-half of this and the whole of the $1,675 note passed back again to defendant. Of course, defendant can not be placed in *statu quo,* but he has lost nothing by the transaction and should not be heard to complain of the results of his own machinations.

VI. The plea of another action pending is not sustained by the record. That case involved entirely different issues from this, and to have abated this suit until the termination of the one pleaded would have been error. The parties are not the same, nor are the issues identical. Moreover, the action pleaded was originally brought by the ward in his own name, and not by his guardian. True, the guardian has had himself

6. ACTIONS: abatement.

substituted in place of his ward; but this was done after this action was commenced.

VII.   Defendant made some improvements upon the property and had paid taxes and other charges thereon and has personally obligated himself to pay the mortgage now standing against it.   These matters were not adjudicated by the trial court for the reason, we suppose, that plaintiff dismissed his action in so far as it involved an accounting for rents, profits, etc.   We need not do more at this time than to say that defendant's claims, if he have any, for improvements, taxes, etc., should not be regarded as determined in this suit.  Neither should plaintiff's rights to an accounting.   These matters are, therefore, expressly reserved for further determination in a proper action.   It should be said in this connection, however, that for the purpose of this case the land should stand as the primary fund for the payment of the mortgages placed upon it by the defendant.   In other words, as he has incurred personal liability by reason of the execution of the notes and mortgages upon the land, and plaintiff has been given the land back without making any return to the defendant, the decree in this case should make the land the primary fund from which the notes secured by the mortgages should be paid.   All this, however, without prejudice to any further action wherein the rights of the parties upon a proper accounting may be determined.

7. CANCELLATION OF INSTRU-MENTS: payment of mortgage.

As thus modified, the decree will be affirmed, and the case will be remanded for this modification.   Appellant, however, will pay the costs of this appeal.—*Modified* and *affirmed.*