G. A. Norelius, Guardian, Appellee, v. Home Savings Bank of Kiron et al., Appellants.

**GUARDIAN AND WARD:** Custody of Ward's Estate—Disaffirmance
1 of Contracts. The guardian of an insane person may disaffirm the contracts of his ward. Evidence held not only sufficient to show mental incompetency of the maker and indorser of promissory notes, but also sufficient to show that the beneficiaries of such instruments knew of such incompetency, and, in addition, obtained the instruments by fraud.

**GUARDIAN AND WARD:** Action to Cancel Contract of Insane Ward—
2 Tender. A guardian, in an action to cancel a promissory note which was both fraudulently obtained from the incompetent ward, and with knowledge of the ward's incompetency, need tender back only that which is left of what the ward received.

Headnote 1: 32 C. J. pp. 736, 787.   Headnote 2: 32 C. J. p. 737.

*Appeal from Crawford District Court.*—M. E. Hutchison, Judge.

May 15, 1925.

Rehearing Denied October 2, 1925.

Plaintiff, as guardian, seeks the cancellation of certain written instruments executed by his ward, on the grounds that the ward was mentally incompetent to execute said instruments, and that they were obtained by the defendants through fraud and conspiracy. The trial court determined the equities in favor of the plaintiff, and entered a decree in conformity to the findings. The defendants, except the Sederbergs, appeal.—*Affirmed.*

*P. W. Harding* and *Robertson & Robertson*, for appellants.

*P. J. Klinker* and *W. A. Helsell*, for appellee.

De Graff, J.—This is an action in equity. The relief sought is the cancellation of two written instruments which

plaintiff, as guardian, alleges were executed May 14, 1921, by his mentally incompetent ward, Albert Johnson, through the fraud and conspiracy of the defendants. The instruments consist of a promissory note for $5,242.36, payable to the defendant Home Savings Bank of Kiron, Iowa, and an indorsement to said bank of a $14,000 note, payable to Albert Johnson and signed by John P. Turin, as maker.

The primary questions on this appeal present issues of fact, which may be stated interrogatively as follows: Was Albert Johnson of unsound mind at the time he executed the note to the defendant bank and made the indorsement of the Turin note? Does the evidence warrant an affirmative finding that the defendants are chargeable with fraud and conspiracy? Are the signatures of the ward to the instruments involved herein forgeries?

The trial court answered affirmatively the first two questions, and deemed it unnecessary to rule the third. We will, therefore, confine this review to the correctness of the findings made.

It is impossible to portray adequately in opinion the impressions received from a careful reading of the entire record; nor is it possible, in a case of this character, within the reasonable limits of an opinion, to recite the evidence in detail.

It may also be stated that, in reaching a correct conclusion on the issues, we cannot divorce the facts bearing on the mental condition of the ward from other facts and circumstances which tend to prove that an imposition was practiced upon him.

The facts disclose that, on May 20, 1921, a few days subsequently to the transaction which gave rise to the instant suit, Albert Johnson was declared by the commissioners of insanity of Crawford County, Iowa, to be a person of unsound mind, and was committed to the hospital for the insane at Clarinda, Iowa. On September 7, 1921, G. A. Norelius was duly appointed, under order of the district court of Iowa in and for Crawford County, Iowa, guardian of the person and property of said Albert Johnson, and qualified as such guardian.

A brief introduction to the parties defendant in this case is necessary. The Home Savings Bank of Kiron, Iowa, is a corporation organized under the banking laws of Iowa. M. P.

Swanson was its acting president, and C. S. Johnson its cashier. Oscar and Aaron Sederberg were brothers, and were severally indebted to the Home Savings Bank in a considerable sum of money. The bank was pressing them for payment of this indebtedness, and efforts were made by them to renew the loan at the bank, which being refused, other parties were interviewed, for the purpose of negotiating new loans. Both the Sederbergs were insolvent at this time. Their financial difficulties were talked over by them with Albert Johnson; and as their friend, he became interested in their behalf, to the extent that he promised to assist Aaron in borrowing money in the amount of $1,500, and agreed to sign a note with Oscar Sederberg to secure a loan whereby the indebtedness of Aaron to the defendant bank could be paid. Several parties were interviewed, without success. On May 11, 1921, Albert and Oscar went to Ida Grove, to borrow this money, and it appears that the bank at that place agreed to make the loan; but, without consummating the deal, Albert and Oscar returned home, the same evening.

The first chapter of the history of the defendant bank with this transaction begins at this point; but before detailing the record facts in this particular, we turn to the evidence bearing on the mental incompetency of Albert Johnson. This is a material inquiry.

It is to be observed that Albert Johnson was adjudicated by a competent tribunal to be of unsound mind, within a week subsequent to the transaction in question. The record is replete with occurrences that indicate that Johnson was weak-minded and suffering from hallucinations. His peculiar and nonnormal acts had been a matter of common observance and the subject of considerable comment. He was seen a number of times, late at night, cleaning the street crossings, with which he had no concern. He imagined that he talked with his mother, who had died about a year previously. He claimed that his mother told him what he should do, and that, as long as he wore the sweater which she had mended, no one could injure or wrong him. He had an obsession that the doctor who attended his mother during her last sickness killed her. He told a great many people that he was a detective, and the best detective in the country. He also claimed that he "would get" certain fellows whom he

did not like, on the 4th day of July, for the reason that "that was a free day, and anybody could shoot on that day." He labored under the impression that he could not lose money if he kept "the numbers," and in one instance, hid a $10 bill in a coal bucket, which was afterwards found and returned to him, as the clerk in the store where he had hidden the money had kept the numbers on the bill, at Johnson's request. On one occasion, when a friend of his was about to be taken to Omaha for a surgical operation, he became greatly excited, and "acted like a crazy man." He drew a check on the 14th day of May, 1921, on the Home Savings Bank for $2,000, for the purpose of making a loan of that sum to one Nordell. He had no money on deposit in this bank; and it is shown that the payee concluded the same day that Johnson was of unsound mind, based on his actions and conduct at that time, and as a result, Nordell destroyed the check and canceled the note. Johnson was not a user of intoxicants, and his peculiar actions are not explainable on any occasion by reason of his drinking alcoholic beverages. He also told several persons that he was afraid that a man by the name of Bill Horan would poison one of his horses. On another occasion, he seemed to think that somebody was after him, and while in one of the stores in Kiron, acted very queerly, and asked the wife of the storekeeper if he had done anything wrong. He imagined, by reason of the ringing of the telephone, that somebody was making inquiry concerning him. His physical condition was also observed. He had a wild stare in his eyes. It is also shown that he would buy cigars and throw them, one at a time, as far as he could, and buy more and repeat the act. At times he would cry, for a considerable period of time. His talk at times was very foolish. He would talk to himself. His actions became so pronounced that it became a subject of public comment, and it was suggested to the authorities that something should be done. It was talked over in the town council meeting, but no action was taken by that body.

When he would talk about his being a detective, he would say: "If I wasn't down town nights, the town would be blowed up." This happened at least two weeks before he was taken to Clarinda. He also claimed, as a detective, that he could trace anything, and that he intended to purchase some bloodhounds.

On one occasion he handed a slip of paper to a man named Salmonson, and said: "If you don't give it back, I will lose $500." What was written on the paper was only partly intelligible. At one time he said to Salmonson, "There are children out there that are going to set fire to the house and blow it up;" and at another time, he came to Salmonson's home and gave him a check for $200, and said, "You can cash it if you want to." He asked Salmonson to give him a check on the State Bank of Kiron, and further said: "If you are short of money, I am going to be a millionaire, and when you need money, call on me."

The foregoing facts constitute some indication of Johnson's mental condition. Did the officers of the defendant bank have knowledge of the acts and doings of Albert Johnson? The town of Kiron had a population of about 300; and it is a well recognized fact that, in a town of that size, the conduct of Johnson would be noised about the neighborhood, and that it would be common talk. The evidence conclusively shows that it was a subject of comment among a great number of people in that town. The mayor had received a number of complaints concerning Johnson's peculiar doings; and at one of the council meetings, the committee on health and nuisance made a report. The defendant C. S. Johnson, cashier of the Home Savings Bank, was a member of the town council, and was present at the time the report was made and the discussion had thereon. At that time, Johnson expressed his opinion that "that fellow is perfectly harmless," and that he did not see that there was anything to be done by the council. It is also shown that the mental condition of Albert Johnson was under discussion between the president of the bank and a Mr. Lundberg. This conversation happened on the evening of May 12th. Lundberg testified that Johnson had wanted him to go with the local doctor with Mr. Ecklund, who was to have an operation performed in Omaha, and that Johnson wanted to give Lundberg $50.

"Johnson cried as long as a minute at a time. He certainly acted like a crazy man. He left me, and said he was going to talk with M. P. Swanson. He said he would go to Swanson and get him to carry out his ideas."

It was that evening that Lundberg talked with Swanson;

and in that conversation, the mental condition of Albert Johnson was discussed between them. Lundberg testified that Swanson said:

"Let's not talk anything about it. We will just have to keep quiet about it."

Lundberg states that in that conversation he probably told Swanson that Johnson was crazy, as he thought he was.

In the light of the record, we cannot escape the belief that plaintiff's ward was of unsound mind and incapable of fully appreciating his situation or guarding his own interests. He was in that condition of mind that an advantage could easily be taken of him. Furthermore, we conclude that the officers of the defendant bank had knowledge of the mental condition of Albert Johnson prior to the transaction in question. The town council meeting to which we have referred occurred on May 2, 1921, and Lundberg's talk with the bank president, Swanson, occurred on the night of May 12th, on which date the defendants claim the note transaction occurred, contrary to the claim of plaintiff that the transaction happened May 14th.

Does the evidence warrant a finding that the note and the indorsement in question resulted from a fraudulent conspiracy? As pointed out, the Sederbergs were heavily indebted to the defendant bank, and the bank was pressing them for payment. Johnson was a friend of the Sederbergs', and the latter undoubtedly knew his mental condition. On May 11th, Johnson and Oscar Sederberg had gone to Ida Grove; and upon their return that evening, the president of the defendant bank voluntarily suggested to Johnson that he had better leave the Turin note with him, as Johnson might lose the note, or it might be burned. Sederberg knew on that day that Johnson had the Turin note with him. The record does not disclose how the president of the bank became informed that Johnson had the note in his possession. Upon being requested to surrender possession of the note for safe-keeping, Johnson objected, and, according to his testimony, argued the matter with Swanson. Finally, however, he gave the note into the possession of Swanson. This happened after banking hours, and in the evening of that day. It further appears that, a few days later, Oscar Sederberg took Johnson to the bank after banking hours, when

it was dark, and at that time and place the cashier of the bank and Sederberg did some talking and figuring. Regardless of the fact that the exact date is in dispute, Johnson, according to the testimony of the defendants, executed a note to the bank for about the amount which the Sederbergs were owing to the bank, and as security therefor indorsed the Turin note to the bank, as collateral. The evidence warrants the finding of the trial court that the transaction happened on May 14th. It is also shown that two notes were given by the Sederbergs to Johnson, a day or two later, which found their way into a safety deposit box which the bank claims that Johnson had in the Home Savings Bank. Johnson denied that he ever had a safety deposit box in that bank; and it is shown that nothing was found in the box, to which he did not have the key, except the two notes of the Sederbergs and a receipt for 50 cents, signed by the agricultural department of the state of Iowa, representing a transfer fee for a stallion, which latter business was transacted by cashier Johnson. It is also shown that, prior to the appointment of Norelius as guardian, Swanson, with his attorney, went to the district judge, seeking the appointment of Swanson as guardian. It is also shown that a letter was written by the wife of Aaron Sederberg to Johnson while he was at Clarinda, telling him to keep away from his guardian, and as soon as he secured his liberty, to come to the Sederbergs, and that the cashier of the bank and the bank's attorney would look after the matter. The Sederbergs were also indebted to Johnson at the time of this transaction; and it is shown that Johnson received no consideration whatsoever for the execution of the note to the bank and the indorsement of the Turin note.

A further discussion of the record will avail little. The act of the guardian was, in legal effect, a disaffirmance of the contracts. That a guardian may disaffirm and avoid the contract of his ward is well settled. *Nutter v. Des Moines Life Ins. Co.*, 156 Iowa 539. The trial court determined that the contracts were not free from fraud; that the defendants did know, and were in a position to know, the mental condition of the ward of plaintiff at the time and prior to the execution of the contracts in question. These findings are supported by the evidence. The

1. GUARDIAN AND WARD: custody of ward's estate: disaffirmance of contracts.

plaintiff did tender the only evidences of the impeached trans-
action in his possession to the defendants, and kept that tender good. The essentials to be proved in this case were established. See *Hale v. Kobbert,* 109 Iowa 128; *Creveling v. Banta,* 138 Iowa 47; *Jefferson v. Rust,* 149 Iowa 594; *Nutter v. Des Moines Life Ins. Co.,* supra; *First Nat. Bank v. Sarvey,* 198 Iowa 1067.

*2. GUARDIAN AND WARD: action to 'cancel contract of insane ward: tender.*

A careful consideration of the record leads us to the con-clusion that the defendants took advantage of the ward's weak-mindedness; and in such a case, equity affords relief. It is fundamental that, if the mental weakness or unsoundness is known to the other contracting party, neither the person labor-ing under the disability nor his representative is required to do more than tender back what he has left of what the ward received. *Jefferson v. Rust,* supra.

For the reasons stated, the decree entered is—*Affirmed.*

FAVILLE, C. J., and STEVENS and ALBERT, JJ., concur.