EDWARD JORGENSEN, Appellee, v. MARIAN M. COFFIE, Guardian, Appellant; C. W. DOWN et al., Appellees.

No. 47139.

DECEMBER 16, 1947.

Clem & Miller, of Sioux City, for appellant.

Shull & Marshall, of Sioux City, for appellees.

MULRONEY, J.—On May 16, 1946, Edward Jorgensen bought an eighty-acre farm in Woodbury county from Carl J. Wolle. He went into possession of the farm land immediately but the contract of purchase provided he was not to take possession of the farmhouse until March 1, 1947. The purchase price was $18,000, of which $3,500 was paid on May 16, 1946, and the balance, down to a first mortgage of $4,500 to the Prudential Insurance Company, was to be paid on July 1, 1946. On June 22, 1946, Jess Coffie, the husband of Marian M. Coffie, handed him a paper which was signed by Marian M. Coffie, as guardian of the property of Helen T. Murphy, and wherein it was stated that on January 19, 1942, Helen T. Murphy had conveyed the eighty-acre farm to C. W. Down and that on November 8, 1944, C. W. Down and his spouse had conveyed the same farm to Carl J. Wolle, and that said guardian claimed Helen T. Murphy was incompetent and of unsound mind at the time she signed the contract conveying the farm to C. W. Down and that the guardian proposed to bring an action to set aside the above conveyances and to invalidate any title that Carl J. Wolle held or claimed to the farm.

Thereafter, on October 22, 1946, Jorgensen filed this quieting title action against Marian M. Coffie, as guardian. The guardian answered and, after securing an order to bring in

new parties, brought in C. W. Down and Carl J. Wolle and their wives, and cross-petitioned and counterclaimed, making the same claim that her ward, Helen T. Murphy, was a person of unsound mind at the time of the conveyance to C. W. Down in 1942. In her pleadings she sought to have the conveyances beginning with the contract of Helen T. Murphy to C. W. Down set aside and the title quieted in Helen T. Murphy, and she offered to put all parties in statu quo.

Upon the issues so joined the action was tried, resulting in a decree for plaintiff, the trial court finding that the evidence "shows that on the date of the sale in question [February 17, 1942] the said Helen T. Murphy was in possession of her faculties and was competent to transact business." The guardian appeals.

■ The presumption is that Helen T. Murphy was sane and mentally competent when the contract of January 1942 was made. The burden was upon the guardian to show that she was not. There was no evidence of fraud or undue influence, so in order to set the conveyances aside it was incumbent upon defendant to show not only that Helen T. Murphy was of unsound mind or insane at the time of the conveyance in January of 1942 but that this unsoundness or insanity was of such a character that she had no reasonable perception or understanding of the nature and terms of the contract. Rickman v. Houck, 192 Iowa 340, 184 N. W. 657; Elwood v. O'Brien, 105 Iowa 239, 74 N. W. 740. We turn to the evidence introduced by defendant.

Helen T. Murphy's maiden name was Kern. She first married John F. Turley and to this marriage her only child, Marian, was born in 1900. Marian is now Marian M. Coffie. John F. Turley died about 1906 and the mother and daughter moved to Iowa about 1909 and lived in Sioux City for awhile, and in 1910 Marian's mother married Jack Murphy. They lived on a farm near Sergeant Bluff, not far from the farm in suit, and in 1919 Marian married Jess M. Coffie. The Murphys and the Coffies then went to Wyoming for a time and while they were there Mrs. Murphy separated from her husband and thereafter obtained a divorce. The Coffies and Mrs. Murphy

returned to the vicinity of Sergeant Bluff about 1922 and lived on a farm until 1934, when the Coffies bought a one-hundred-thirty-five-acre farm, which joins the farm in suit, and they moved to the new farm. While Mrs. Murphy did not live with the Coffies all of the time, it does appear that she made their home her headquarters and lived there most of the time from 1922 to 1940. In 1933 she bought the farm in suit, which was known as the Holman eighty. The Coffies had rented this eighty for two years before Mrs. Murphy bought it. On February 6, 1946, Helen T. Murphy was committed to Cherokee State Hospital by the commissioners of insanity of Woodbury County, Iowa, upon the filed information of Marian M. Coffie. The record shows that the commissioners found Mrs. Murphy "senile and a fit subject for admission at the State Hospital, Cherokee, Iowa." On February 19, 1946, Marian M. Coffie was appointed guardian of the property of Helen T. Murphy.

A great many witnesses were called by the guardian for the purpose of showing the mental condition of Helen T. Murphy. Among these witnesses were neighbors and acquaintances of long standing and there was some medical testimony. Marian M. Coffie testified at length and said that as far back as she could remember her mother "wasn't as other mothers were." She told of a trip she and her mother made to Tennessee in 1911, where they stayed at her aunt's home in Chattanooga, and her mother was taken to a sanitarium in Chattanooga, and later to a private sanitarium in Memphis, where she stayed for nine months. She said that she was not "released as cured." Marian was eleven years old at the time. From 1912 on they lived on the farm near Sergeant Bluff and she told of their life with her stepfather, Jack Murphy. She said her mother and Murphy did not get along well, although Murphy was always good to her. She told of her mother's actions when she lived in her home after she had married Jess Coffie. She said she was always jealous of her children. She said there were times when she would be kind-hearted and agreeable but "you couldn't please her." She said she would always want all the attention and she would get mad and moody and criticize the members of the household and slam her knife and fork down and walk away. She said her mother bought the

eighty-acre farm in 1933 with life insurance money from a policy on the life of her mother's brother who had committed suicide. She said her mother would threaten that if she ever saw the aunt in Tennessee who had put her in the sanitarium she would shoot her.

Mrs. Blocher, who lived in Sioux City, testified Mrs. Murphy stayed with her for a month in January 1937; that while with her she put the shears, ice pick, and butcher knife under her pillow at night, saying she was afraid Mrs. Blocher was going to kill her. She testified Mrs. Murphy was "incompetent mentally" and that, "You couldn't class her as normal mentally because she did so many things to lead you to know, absolutely know, that she wasn't in her right mind all the time."

Sometime in 1941 or 1942 she did housework in a Sioux City home. The householder testified she worked a week or ten days and then had her hand crushed in a washing machine, and stayed on in the home for another month doing nothing, and then sued the householder for $1,000 but lost the suit. This witness said:

"I observed the actions of Mrs. Murphy when she was at our house and paid attention to the nature of her conversations or what she said. I was kind of uneasy all the time, she used to run here, run there, tell stories and talk so much. I didn't like it. I kind of talked to my wife, 'That woman is kind of incompetent. She is funny.' And anyway she talked so much it's not normal. Her talk was not too sensible. * * * She was kind of a lightweight."

In February 1942, Mrs. Murphy was living at 515 Eighth Street in Sioux City, and the lady who had the apartment across the hall testified Mrs. Murphy used to come into her apartment often. She said Mrs. Murphy lived at this place for about three months and that, "She was excited all the time. * * * manifested a very revengeful spirit. * * * went from apartment to apartment and talked so much. * * * She would sit in her room and mumble and talk to herself * * * Her talk was generally concerning her troubles she had had with * * *

people * * * She seemed to be so angry at so many people." This witness said: "I would definitely say she was anything but normal. I think she was mentally incompetent."

A man who did carpenter work for the Murphys in 1916 and 1917 told of their home life and of how Mrs. Murphy would on occasions start "cussing Mr. Murphy" and throw bricks at him. He said: "I formed my opinion, I feel she was awful mean or else she wasn't right in her mind, one of the two."

Mrs. Edna Murphy, who was seventy-three years of age and the widow of Charles Murphy, Jack's brother, lived in the same vicinity. She said:

"I don't think she was normal by any manner of means. She wasn't according to the way we were raised, anyway, in her conduct and in her home."

Another. farmer neighbor testified that he did not think Mrs. Murphy was a normal person, and when asked in what way she seemed out of the ordinary, he made this reply:

"Oh, in a conversation-way, always wanted to be talking, different things that wouldn't interest me she would insist upon my listening to it anyhow."

Jess Coffie corroborated much of his wife's testimony. He said:

"She seemed to be awful bold and forward, seemed to want to be in the limelight, wanted lots of attention. Wanted to be the center of attraction. Jack Murphy couldn't do a thing to suit her, and she knew it all."

He said on one occasion she chased Jack and him with a butcher knife and she would "throw anything that she could get hold of, dishes * * * or flat irons. * * * If anyone disagreed with her, she would likely do something like that." He told of the incident in 1940 when her daughter asked her to sit "a little more ladylike" and she got mad and left their home for good. He said that starting in 1940 he "never thought she was competent."

Mr. Hunt, who had been supervisor and mortgage loan solicitor for the Prudential Insurance Company since 1931,

dealt with Mrs. Murphy in the matter of the Prudential mort-gage on this farm in 1936. He stated that he conferred with the Coffies át the time. He had no recollection that they raised any objections to Mrs. Murphy's making the loan. They did not say anything to him about Mrs. Murphy not being compe-tent to handle the business. He said Mrs. Murphy was odd in a lot of ways; that she was eccentric, but probably competent to handle the business he was having with her.

There was much in the testimony of the activities of the Coffies to set aside the January 1942 sale, and testimony of statements of Mrs. Murphy that she wanted to get out of the contract. The Coffies consulted lawyers and at first Mrs. Coffie started a suit in 1942 to have her mother declared incompetent and asked that a guardian be appointed for her. Mrs. Murphy filed an answer to this suit but the suit was abandoned and later dismissed for lack of prosecution. Next the Coffies were sued for rent for 1942 by Down, who had also received an assignment of the lease in the purchase of the farm, and the Coffies filed a cross-petition praying for specific performance of an oral option contract to purchase the eighty acres which they claimed to have had with Mrs. Murphy at the time Down pur-chased the eighty acres. The Coffies lost their suit on their cross-petition and the judgment of the trial court was affirmed on appeal to this court. See Down v. Coffie, 235 Iowa 152, 154, 15 N. W. 2d 216, 217. The record here would indicate that our statement in the opinion referred to, to the effect that at the time the case was tried "Mrs. Murphy was under guardian-ship" was probably erroneous, but in any event, the Coffies testified she was against them in that trial; that she was present all during that trial, "sitting with Mr. Wolle."

The Coffies said they had often borrowed money from Mrs. Murphy; that they had paid her back whenever she wanted it and that they still owed her around a thousand dollars. They said their attorneys had told them that when testifying in the former suit to enforce the alleged oral contract with Mrs. Murphy they were not to say anything about her being in-competent.

It was stipulated that Dr. Obermann, Superintendent of the Cherokee State Hospital, would, if present, testify that at

the time of her admittance she was not only senile but had a mental derangement referred to as manic-depressive insanity with paranoid tendencies. One Doctor Rohwer, who examined Mrs. Murphy in April of 1942 and saw her four or five times in a period of a week or ten days, testified that his "original impression of this lady was that she was rather excited, highly intelligent, aggressive, sensitive type of an individual." His original impression changed, however, when she visited him three or four times more. He said she was upset and belligerent and he considered her a manic-depressive type of individual with a neurotic type of brain. As we read and reread the pages of this doctor's testimony, we are convinced it is of slight value as proof that Helen T. Murphy was of unsound mind or incompetent in January of 1942. About all he said was that Mrs. Murphy's type of mental derangement would have a variable effect on her ability to exercise intelligent business judgment. He said such persons may be highly intelligent and capable and they might not be.

From plaintiff's testimony we learn that the property was sold through the Buckwalter real-estate agency in Sioux City, and W. C. Wolle, a brother of the present titleholder and a brother-in-law of Down, was the agency salesman who handled the sale to Down. He said he first met Mrs. Murphy about a month before the sale; that she seemed friendly and that she seemed to know what she wanted to do with her money and she seemed capable of taking care of her affairs. He said the sale arrangement involved her placing the deed in escrow with the Woodbury County Savings Bank. There was some evidence that Down and Carl J. Wolle were together in the purchase from Mrs. Murphy, or at least that Carl J. Wolle put up part of the purchase price paid by Down and Down later transferred to Carl J. Wolle for the same consideration he paid Mrs. Murphy.

A vice-president of the Woodbury County Savings Bank testified he had known Mrs. Murphy for fifteen years and had seen her quite frequently; that she had carried an account at the bank during those fifteen years and consulted with bank officials on securities. He said he remembered, in a general way, that Mrs. Murphy had consulted with him in regard to

▰▰▰▰▰▰▰▰▰▰▰▰

the sale of this farm, both before and after the sale. She told him she was having difficulties with her daughter and son-in-law ''about getting them to pay rent.'' He said he did not feel she was incompetent but on the contrary was ''quite intelligent in her discussion of business matters.''

As to the adequacy of the consideration, we learn from defendant's witness Hunt, and one other defense witness, that in January of 1942 the property was worth $195 to $200 an acre; and that the increase in value from 1942 to 1946 of such property was thirty to thirty-five per cent. Plaintiff's witness, W. C. Wolle, the real-estate salesman, said it was worth about $135 an acre at the time it was sold.

▰ Upon all of the evidence we believe the conclusion of the trial court was right. There was no evidence that any fraud or undue influence was practiced upon Mrs. Murphy. Defendant's evidence of value was much stronger than plaintiff's and it may have been that the sale was a poor sale from the seller's standpoint, but the law does not require that a person should be able to make a sale that is a good bargain as a test of mental capacity to make a binding contract of sale. There is not the slightest evidence but that she knew what she was doing. While there is much testimony of abnormal behavior, those who dealt with her in a business way seemed to feel she knew how to take care of her property.

Since we agree with the trial court's conclusion, there is no necessity to discuss questions that would arise if Helen T. Murphy was incompetent at the time she sold the farm.

The decree is affirmed.—Affirmed.

OLIVER, C. J., and BLISS, HALE, GARFIELD, SMITH, and HAYS, JJ., concur.