CARL O. SJULIN, guardian of property of DAVID STERLING
SJULIN, appellee, v. CLIFTON FURNITURE COMPANY
et al., appellants.

No. 47568.

(Reported in 41 N.W.2d 721)

MARCH 7, 1950.

REHEARING DENIED MAY 5, 1950.

Nichols & Nichols, of Sidney, for appellants.

Edwin Getscher, of Hamburg, and Edward E. Eaton, of Sidney, for appellee.

GARFIELD, J.—On January 10, 1948, David Sterling Sjulin, called Sterling, age twenty-four, purchased furniture from defendant Clifton (Clifton Furniture Company is merely a trade name) for which he paid $1121.29. Two days later Sterling was adjudged insane pursuant to chapter 229, Code, 1946, by the county commission of insanity and committed to the Veterans Administration Hospital for the insane at Knoxville where he was still confined when this cause was tried in October 1948. Sterling's father was appointed guardian of his property by the Fremont County district court on April 21, 1948, and

brought this equity suit on May 5 to avoid the contract and recover the purchase price. From decree as prayed defendant has appealed.

■■ I. Of course it is presumed Sterling was sane when the contract was made and the burden rests on plaintiff to show he was incapacitated from making it. To avoid the contract it must appear not only that Sterling was of unsound mind when it was made but that this unsoundness was such that he had no reasonable perception of the nature and terms of the contract. Mere mental weakness or unsoundness to some degree is not sufficient, in the absence of fraud or undue influence, to invalidate a contract. Elwood v. O'Brien, 105 Iowa 239, 74 N.W. 740; Evers v. Webb, 186 Iowa 1172, 1178, 173 N.W. 264; Jorgensen v. Coffie, 238 Iowa 1268, 1270, 30 N.W.2d 116, 117; 17 C. J. S., Contracts, section 133a, page 482. See also 28 Am. Jur., Insane and Other Incompetent Persons, section 66.

■ Under repeated decisions we are warranted in giving weight to the trial court's decision upon disputed facts although our review is de novo. After doing so we reach the same conclusion as the trial court did. The evidence is about as follows:

Sterling graduated from high school with good grades in his home town of Hamburg and attended the State University of Iowa two years. He was in the armed service from May 1943 to March 1945, and was overseas about four months. Upon his discharge he was accompanied to his parents' home in Hamburg by a military guard, it is to be inferred because of his mental condition. At intervals between the time of his discharge and his commitment to the hospital for the insane he worked in a nursery operated by his father at Hamburg. His work was unsatisfactory and of little if any value. He appeared to be unable to fill orders, type names on a mailing list or to cut gladioli.

Although Sterling had never played baseball, in the spring of 1947 he purchased a quantity of baseball equipment and said he would become a great pitcher by attending a school of instruction in Arkansas. He went to this school but returned in about a week. In the summer of 1947 Sterling bought tennis

equipment and stated he was one of America's champion tennis players, although he had not played before. During the same summer and in the fall he bought two shotguns and a rifle and said he thought he was a great hunter. The day before the duckhunting season ended he bought a dozen decoy ducks over his parents' protests. Also in the summer of 1947 Sterling bought drums and stated he would organize an orchestra but did nothing to that end.

Sterling wrote a novel, sent it to publishers and in the winter of 1947 went to New York to see publishers about publishing it but it was rejected. In 1946-47 he expressed interest in atomic energy and wrote Chairman Lilienthal of the Atomic Energy Commission. Sterling said if he could attend California Polytechnic Institute he could learn about atomic energy and bring peace to the world. He made a three-weeks trip to California and upon his return stated he was refused admission to the institution.

For two weeks in March 1946 Sterling was treated at the Psychopathic Hospital at the State University of Iowa. For about six weeks in the summer of 1946 he was treated by Doctor Ash in the psychiatry department of a Council Bluffs hospital. Between July and Christmas, 1947, Sterling consulted Doctor Kerr, a general practitioner at Hamburg, seven or eight times. On December 20, 1947, Sterling was examined by Doctor Cash, a psychiatrist then in Omaha.

Doctor Kerr testified Sterling was permanently insane, suffering from schizophrenia, paranoid type, that he had a terrific inferiority complex, delusions of grandeur and persecution, contemplated self-destruction, was growing progressively worse and he felt Sterling was not competent to buy furniture. Doctor Cash also gave the opinion Sterling was not sane or competent and was suffering from progressive schizophrenic illness, there was not much likelihood of even temporary recovery, he was not competent to manage his own affairs, some of his purchases before the examination on December 20, 1947, resulted from poor judgment which was part of his illness. On January 7, 1948, Sterling was examined by doctors, including a neuro-psychiatrist, at the Veterans Administration Hospital in Des Moines.

Sterling lost many articles. When he returned from the University Hospital in March 1946 he forgot most of the clothes he had taken with him. He returned from New York without his overcoat. While in California he lost a bank draft his father sent him. He returned from another trip without his typewriter and suitcase.

In December 1947 Sterling had three dates with a girl from Shenandoah he had not previously known. He asked her to marry him but she refused. They had no talk about renting a house or buying furniture. She testified she considered him rather odd and different but not of unsound mind. About December 31 Sterling told his father he was going to marry this girl, he rented a house in Hamburg and gave his check for the rent. The man and wife who owned the house had no previous acquaintance with Sterling but gave their opinion he was of sound mind.

About this time Sterling looked at furniture at defendant's store and on January 10 selected articles for the rented house for which he wrote his check for $1109.15. He had told defendant he had about $3000 to spend for furniture and for an automobile, he had located an automobile for $1800 and wanted to keep the cost of the furniture within the balance of the $3000. Accordingly some changes were made in the articles to be purchased which lowered the cost to $1109.15 (total amount with tax seems to have been $1121.29). Defendant, who had not known Sterling before, expressed the opinion he was sane.

Before the furniture was delivered defendant told Sterling his parents would object to the transaction and defendant would require the cash before delivery, he called the owner of the house to inquire whether Sterling had rented it, asked an acquaintance if Sterling was of age and took the check to the bank to obtain credit thereon. When the furniture was delivered Sterling helped unload it and put it in place in the house. Sterling's parents were present and his father objected to the delivery of the furniture because of the son's mental condition. Sterling then threatened his father's life.

On the day defendant delivered the furniture an information under Code section 229.1 was filed, presumably by Sterling's father, charging Sterling with insanity and the sheriff took

the young man into custody. Sterling told the sheriff several times that he had a house rented and furnished, was going to marry the Shenandoah girl and move into the house. He threatened to kill both his father and the sheriff.

Defendant offered no expert testimony to rebut that given by Doctors Kerr and Cash. In fact, there is little if any dispute in any of the above evidence. Aside from the Shenandoah girl the only witnesses to express an opinion Sterling was of sound mind were defendant and the man and wife who rented him the house. They could scarcely be expected to express a contrary opinion. As stated, they did not previously know the young man. We think the evidence sufficiently shows Sterling's mental incapacity to contract for the furniture.

II. Defendant contends the trial court erred in finding that when the furniture contract was made Sterling, because of his unsoundness of mind, was under the false impression he was to be married and because of such impression attempted to enter into the contract and that his insanity was directly connected with the subject matter of the contract and was of such character as to incapacitate him from making it.

This finding is not contained in the decretal part of the decree and is unnecessary thereto. Other findings, especially one immediately preceding that complained of, amply support the decree. If the decree is right, and we think it is, any error in the finding complained of is deemed not prejudicial and entitles defendant to no relief here. Roth v. Headlee, 238 Iowa 1340, 1348, 29 N.W.2d 923, 927, and citations; Lautenbach v. Meredith, 240 Iowa 166, 168, 35 N.W.2d 870, 872.

However, we agree with the challenged finding and insofar as it may state a legal conclusion we agree with such conclusion. See in this connection Swartwood v. Chance, 131 Iowa 714, 109 N.W. 297; Reese v. Shutte, 133 Iowa 681, 108 N.W. 525; Mathews v. Nash, 151 Iowa 125, 130 N.W. 796; 17 C. J. S., Contracts, section 133a, page 482.

III. Defendant's third and fourth propositions will be considered together. They are that the trial court erred (3) in finding that defendant had notice, before the sale of the furniture, Sterling was suffering from mental difficulties, and

(4) by return of the furniture defendant will be placed in statu quo.

■ An executed contract may be avoided upon the ground one party was mentally incapable of making it when the other party may be placed in statu quo, even though the other did not know of the incapacity and the contract was fair and upon full consideration. Swartwood v. Chance, supra, 131 Iowa 714, 715, 109 N.W. 297, and citations; Nutter v. Des Moines Life Ins. Co., 156 Iowa 539, 543, 136 N.W. 891; 17 C. J. S., Contracts, section 418e, page 904. See also Christian v. Waialua Agr. Co., 9 Cir., Hawaii, 93 F.2d 603, 610, and citations, reversed on other grounds, 305 U. S. 91, 59 S. Ct. 21, 83 L. Ed. 60.

However, where the executed contract of an incompetent has been entered into in good faith, for a fair consideration, without notice of the insanity and before an adjudication thereof, it will not be set aside unless the other party can be put in statu quo. Reeves v. Hunter, 185 Iowa 958, 961, 171 N.W. 567; annotation 46 A. L. R. 416, 419, supplemented in 95 A. L. R. 1442, 1443; 28 Am. Jur., Insane and Other Incompetent Persons, section 84; 17 C. J. S., Contracts, section 438.

■ Where the other contracting party has knowledge or notice of the insanity restoration to him of the status quo is unnecessary but the incompetent or his representative is required only to return what is left of what was received under the contract. Norelius v. Home Savings Bank, 200 Iowa 613, 620, 203 N.W. 809; Jefferson v. Rust, 149 Iowa 594, 606, 128 N.W. 954; 17 C. J. S., Contracts, section 438.

Thus if defendant is placed in statu quo it is not important whether he had knowledge or notice of Sterling's incapacity. If defendant had such knowledge or notice he would not be entitled to be put in statu quo but only to the return of such furniture as plaintiff was able to return.

The trial court found defendant had notice of Sterling's incapacity. Also that the furniture was in substantially the same condition as when delivered by defendant and its return to him, which was decreed at plaintiff's expense, would restore the status quo. Either finding, if warranted by the proof, would entitle plaintiff to recover, provided, of course, Sterling was

mentally incapable of making the contract. We feel the evidence supports each finding.

The record regarding knowledge or notice to defendant of Sterling's condition is unusual. At the outset of the trial, although the case was in equity, "by agreement of counsel the court was asked to rule upon objections to evidence." In sustaining some objections and motions to strike the trial court seemed to feel the question of knowledge or notice to defendant was immaterial although it was a pleaded issue bearing upon plaintiff's right to recover without restoration of the status quo. As defendant contends, the evidence was proper. The record shows what such testimony is or would have been if received. We have therefore considered it. See Iowa Electric Co. v. Home Insurance Co., 235 Iowa 672, 676, 677, 17 N.W.2d 414, 416, and citations; Brown v. Schmitz, 237 Iowa 418, 424, 22 N.W.2d 340, 343.

We deem it unnecessary to set out the evidence we believe shows that before the contract was made and the furniture delivered defendant had notice of Sterling's incapacity. However, we do not agree with defendant's argument that this finding rests solely upon testimony of Sterling's mother. Defendant's own evidence as to precautions taken by him before he delivered the furniture quite clearly indicates he then knew he was not dealing with a normal person and that such litigation as this would be apt to follow.

But even if defendant, as he contends, were without notice of Sterling's incapacity, we feel plaintiff would be entitled to recover because defendant will be put in statu quo by return of the furniture. It appears without dispute the furniture has never been used and "is just like it was when received." A few days after plaintiff was appointed guardian it was moved from the rented house to other quarters for storage. Defendant was asked, soon after Sterling was sent to Knoxville, to take back the furniture but he declined to do so. The petition contains a tender back of the furniture. The answer admits defendant has refused to receive the property and restore the purchase money.

Defendant's contention that return of the furniture will not restore the status quo is based on evidence it declined in

value thirty per cent between time of delivery and plaintiff's appointment as guardian, a little over three months, on the theory it became used furniture by the sale and delivery. Defendant also offered to prove the cost of the furniture to him was two thirds the retail price while his net profit was only ten per cent of such price and that the difference between the wholesale cost and the net profit was cost of selling. Defendant argues he will not be put in statu quo unless plaintiff pays him the difference between his wholesale cost and net profit in addition to return of the furniture. Defendant cites no authority that supports his argument and none has come to our attention.

 The basic principle upon which restoration of the status quo is required in order to avoid a contract is that he who seeks equity must do equity. Neblett v. Macfarland, 92 U. S. 101, 103, 23 L. Ed. 471, 472; 19 Am. Jur., Equity, sections 463, 464.

The rule requiring restoration of what was received is not to be applied strictly but in accordance with equitable principles and the rescinding party is required to do only what he should equitably do. See Hale v. Kobbert, 109 Iowa 128, 130, 80 N.W. 308; Campbell v. Moorehouse, 141 Iowa 568, 120 N.W. 79; 17 C. J. S., Contracts, sections 438, 439; 46 Am. Jur., Sales, section 766. We think return of the furniture is all the equities of the case require.

 In the absence of laches diminution in value of the property since its transfer presents no objection to rescission and return of the property. Neblett v. Macfarland, supra, 92 U. S. 101, 104, 23 L. Ed. 471, 472; Darelius v. Commonwealth Mortgage Co., 152 Minn. 128, 188 N.W. 208, 211; 17 C. J. S., Contracts, section 439, page 923. And see Hale v. Kobbert, supra, 109 Iowa 128, 130, 80 N.W. 308; Restatement of the Law, Contracts, section 349, comment b.

Defendant is entitled to be put in the position he occupied *before* the transaction complained of. Neblett v. Macfarland, supra. Plaintiff should also be placed in the position his ward then occupied. We have said the rescinding party is entitled to no profit from his bargain. Campbell v. Moorehouse, supra, 141 Iowa 568, 572, 120 N.W. 79. We know of no reason why

the other party should have any part of his gross profit. If plaintiff were compelled to pay defendant money in addition to the return of the furniture he would not be left in the position his ward occupied before the transaction while defendant would occupy a better position.—Affirmed.

All JUSTICES concur.