1. **Evidence**: CONFESSIONS: CRIMINAL LAW. Where one arrested upon a charge of murder was taken from the officer by a mob, and, under threats of violence, confessed his guilt, and afterwards, although warned that his confession might be used against him, repeated it in the presence of a number of the mob who had before threatened him, under promises from them that they would protect him, such confessions were properly excluded from the jury.

2. ———: ———: THEIR ADMISSIBILITY. A confession is only admissible when it is free and voluntary. It cannot be received in evidence when extorted by threats, or obtained by promises, however slight, or by the exertion of any improper influences.

3. ———: ———: WHERE A FORMER CONFESSION HAD BEEN MADE. If a confession has been obtained from a prisoner by undue means, any subsequent statements made by him under the influence of that confession, are incompetent. The lapse of ten months after the first confession, during which the defendant was confined in jail, is not conclusive that the influences under which it was made have ceased to operate.

*Appeal from Crawford District Court.*

TUESDAY, JUNE 30.

On the 10th day of April, 1873, the defendant was indicted in the Greene District Court, for the murder of Charles W. Kendall, and on the 11th of the same month, he filed his plea of not guilty. The venue was changed to Crawford County. At the September term, 1873, the cause was tried. Defendant was found guilty of murder in the first degree, and was sentenced to the penitentiary for life. Defendant appeals.

*Henderson & Howard,* with whom are *J. & H. C. Henderson,* for appellant.

*M. E. Cutts,* Attorney General, for the State.

DAY. J.—The principal evidence against the defendant was his confession. The admissibility of evidence of this confession is the only question which we need consider.

The facts necessary for a full understanding of the circum-

stances under which the confession was made, are as follows:
The deceased was missing on the 19th day of December, 1872,
and he was found dead on the afternoon of the following Sun-
day. On Thursday, December 26th, at seven o'clock in the
evening, Andrew Watts, sheriff, and Enos Cahill, deputy
sheriff of Greene County, arrested defendant, at his residence,
for the murder, and took him a distance of eight miles, to the
depot of the North Western Railroad, in Scranton. That
night the depot was broken open by a mob of about forty
men, some of whom were armed, and the defendant was forci-
bly taken from the custody of the officers.

This mob conveyed the defendant to a school house, how
far distant from Scranton the evidence does not disclose.
About twelve o'clock that night they dispatched a messenger
to the house of one James Dillavon, who lived near by, and
1. EVIDENCE: whose son was one of the mob, for a rope. Two
confession.
criminal law. hours thereafter James Dillavon was informed
that defendant had made a confession, and he repaired with
the messengers to the school house. There were present
George McPherson, Jack Gray, P. M. McCready, William
Cochran, and others, in all about forty persons. On Friday
morning the party returned with the defendant to Scranton.
The preliminary examination was adjourned until Monday.
The mob refused to allow the sheriff to take the defendant to
Jefferson, insisting that he should not go out of the town-
ship, and the sheriff thereupon deputized George McPherson,
James Dillavon, and A. J. Gray, and had them sworn in by
the Justice of the Peace, and left the defendant in their cus-
tody. On the morning of the same day, Friday, C. H. Jack-
son, who was present for the purpose of managing the prose-
cution, in the presence of several persons, and at their instance
and request, had a conversation with defendant. Jackson
told defendant that he and the others had had a conversation
respecting his making a statement. That any statement or
confession he had made to the crowd on the night before,
would not be used against him as evidence; that it was
improper and irregular. But that anything he stated now
could be used against him as evidence, and to be careful what

he said. The evidence shows that the feeling of the crowd appeared to be very friendly to defendant at this time, and to be against the Hamilton boys, who appear to have been implicated, by the previous confession of defendant, in the crime of robbery. Defendant was taken before I. J. McDuffie, who also was present as attorney for the State, for the purpose of having his confession written down. He seemed subdued, like one whose spirit had been broken, but stated that he made the confession of his own free will, and that he wanted to make it. He was informed by McDuffie that any statement he made might be used against him. At the time the statement was made there were eight or nine persons in the room, and more were trying to get in, and there were fifteen or twenty around. McPherson, Dillavon and Gray took a very active part. Parties present said if he would tell the truth and stand by his statement made the night before, they would protect him. Jack Gray made this statement. McPherson said: "we are your friends; all we want is for you to tell the truth." Jack Gray said, "if he would stand by his statement, they would protect him; they would spend their farms to clear him." They said "they would bail him;" that "if he would give evidence to convict the Hamilton boys, they would see him through this prosecution for murder."

Whilst his confession was being written down the parties present kept interrupting him. Jack Gray kept referring to the statement at the school house, and saying, " that is not the way you said it there; what we want is the truth." Gray was for keeping the statement as made the night before, and " every once in a while he would dictate for defendant," and would say, " you know what you told us." Defendant would say he had forgotten, and conform the statement to the suggestions.

This confession, and the one made at the school house, the court excluded.

On the Monday following, defendant was taken to jail at Marshalltown. Some time in the latter part of February, McPherson and McCready visited defendant in the jail, for the purpose of learning more respecting the Hamilton boys. They remained with him, alone most of the time, for eight or

ten hours, the jailer being in a little time toward evening. At this time, the evidence shows, they explained to defendant why they had not bailed him out; they promised to stand by and protect him. McPherson told him they would stand by him and protect him from the rest of his colleagues; that he had been to see the Governor; and something was said about get- ting up a pardon. The evidence shows, also, that at this time the defendant was free from excitement. At this time the defendant made a statement, which was admitted in evidence, and which, in the language of the witness McPherson, is as follows: "In Marshall he told me that he fired the signal gun to let his brother know Charles Kendall had crossed the river, and after he had fired the signal gun he heard a shot up the river, and started and walked up the river until he met his brother coming down the river; they stopped, had a little conversation about what he had done, and then turned and walked to the body—to where Charley's body lay, and he stated that he walked within a few feet of it, (if he stated how close, I disremember,) and looked at the body lying there; and then they turned and walked down the river again together, to pretty near the mouth of Cedar creek, I think, as near as I can recollect. And there they parted, and Alva Chambers, his brother, went up Cedar creek, and he came down the river home to his own place. I asked him if there was anybody else connected with it, and he firmly protested that there was none else connected in the crime but himself and brother. He stated about going to Kious' for pop-corn after he got home, I think is what he said." The evidence also shows that this statement does not differ from the one made at Scranton.

A confession, in order to be admissible, must be free and voluntary; it must not be extracted by any sort of threats, nor **2. ——: ——: their admissibility.** obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. 2 Russell on Crimes, 644; Roscoe's Criminal Evidence, 39; 1 Greenleaf on Evidence, Section 219, and cases cited.

It is clear, beyond any question, that the confession made at Scranton, was properly excluded. Not only were the strong-

The State v. Chambers.

est inducements to expect favor and assistance held out to defendant, by the sworn deputies of the sheriff who had him in custody, and were in the exercise of authority over him, but they constantly interrupted him in his statements, and by their interference and dictation they caused him to make it conform to one he had made the night before in the hands of a mob, and stimulated by the presence of a rope. All the circumstances surrounding this confession exclude the idea that it was made freely and voluntarily, and remove all probability of its truth.

If a confession has been obtained from a prisoner by undue

3. ——: ——: means, any statement afterwards made by him
where a for-
mer confes- under the influence of that confession cannot be
sion had been
made.    admitted. Roscoe's Criminal Evidence, 41; 2 Russell on Crimes, 648, and authorities cited.

Where such second confession is offered in evidence, it must clearly appear that the influences under which the first was made have ceased to operate. Nothing but the mere lapse of ten months time, during the whole of which the defendant was confined in jail, is shown in this case. The defendant was told, at the time he made the confession at Scranton, that it was admissible in evidence against him. He was not informed at the time of making the last confession, that the former one was not admissible. If he had been so advised he might have refrained from making any further confession. But believing the first confession admissible, the strong probability is that he concluded a repetition could make the case no worse, and that the last confession was made under the influence of the preceding one. Further, there is nothing to show that the assurances of friendship, and the promises of protection and aid were not still operating upon, and influencing his mind. It is true he was advised that they could not bail him out, but other promises of assistance and support had been made, and he was not informed that these promises would not be kept. It is to be borne in mind that the last confession was made to McPherson, the leader of the mob, and one of the most active in procuring the confession at Scranton, and to McCready, another of the "forty." Even at the last interview McPherson explains

why they had not bailed him, assures him they will stand by and protect him. Speaks of a visit to the Governor, and inspires his hopes by mention of a pardon. We are well satisfied, from the whole record, that the last confession was made because of the former one, and under the same influences that produced it. It was therefore inadmissible, and should have been excluded from the jury. See Roscoe's Criminal Evidence, page 43, and cases cited. 1 Wharton's Criminal Law, section 694, and cases cited.

REVERSED.