STATE OF IOWA, appellee, v. GEORGE RAYMOND ARCHER, appellant.

Nos. 47962
48125.

(Reported in 58 N.W.2d 44)

1046

April 8, 1953.

Rehearing Denied June 12, 1953.

Emmett P. Delaney and John L. Delaney, both of Clinton, for appellant.

Robert L. Larson, Attorney General, Raphael R. R. Dvorak, Assistant Attorney General, Kermit G. Kruse, County Attorney, and Walter W. Eggers, Special Prosecutor for Clinton County, for appellee.

THOMPSON, J.—The body of Mrs. Lillian Chapman was found in an alley in Clinton on the morning of May 30, 1950. Some of her ribs on the right side were broken, her body had several bruises, and a scarf was drawn tightly around her neck. The medical testimony was that death was caused by strangulation. Her clothing was disarranged, her nether undergarments being entirely removed. Apparently from this it was suspected she had been a victim of rape, but the medical testimony failed to substantiate that fact.

Mrs. Chapman's age is variously given as having been from sixty to seventy-two years. That her death was felonious and had occurred during the night of May 29-30 admits of no doubt. She lived near by and there is no explanation of how she happened to be out on the streets on the night in question. She lived

with her sister who did not know she had gone out until the morning of May 30. Apparently no one saw her out of her home that night, except the slayer.

The Clinton police force and the county attorney's office of course interested themselves in the case and began a search for the killer. This was unsuccessful for many months, as will presently be shown in more detail.

The defendant herein, an itinerant laborer, had been in and out of Clinton for a year or so before the date of the crime, and for a few months prior thereto had been employed by one Charles Smith on his farm across the Mississippi River in Illinois. Charles Smith had a brother, Lafayette Smith, living in Clinton. The defendant, then known as Jack O'Day, had worked for Lafayette Smith at times, and it was through this connection he met the brother Charles and entered his employ. He was about forty-six years of age at the time. On occasion he would come to Clinton with Charles Smith and visit for a few hours at the house of Lafayette Smith, often eating his evening meal there. This occurred on May 29, 1950. On that date Charles Smith advanced him six dollars for the purpose, ostensible or real, of purchasing some clothing. But, after visiting with the Lafayette Smith family and eating his supper there he left their home and that night disappeared from Clinton. He had told Mrs. Charles Smith he expected to go west to "make the harvest", and had said to another woman who lived in their home that he liked to ride freight trains and might go any time; that he expected to leave about June 1.

Although the Clinton authorities knew within a few weeks that he had left Clinton on the night of the murder, they apparently did not give it great significance until they had no success in locating a more likely suspect. That the defendant was not a criminal fleeing from the scene of his crime is shown by the fact that on many occasions during the next eight months or more he communicated by letters or post cards with friends in Clinton, each time giving his present location. Mrs. Lafayette Smith says she heard from him about every week or ten days. On two occasions he sent clothing for the Smiths to keep for him, and once at least asked them to forward it to Sheridan, Wyoming, where he wrote he had a job and expected to be for

some time. She learned from a post card sent about the middle of February 1951 that he was in Casper where he was employed.

About this time the Clinton police, having failed to solve the mystery of the slaying, and having no likelier prospect, wrote the police at Casper, Wyoming, where the defendant was readily located through his communications with friends in Clinton, asking them to question him. No charge was then filed against him, either in Iowa or Wyoming. The chief of police at Casper thought so little of the gravity of the matter that instead of taking defendant into custody forthwith he left word with the landlady at his rooming house that he wanted to see him. This was on February 20, 1951. The defendant, upon returning from work, was given this message. Although thus duly warned he reported at the police station the same evening. This, again, was not the act of a man with a conscience scarred by murder. But as soon as he appeared at the Casper police station he was thrown into a cell and held without charge or warrant. This was almost nine months after the commission of the crime.

Here it is material to point out that, except for the confessions obtained from defendant, there is no syllable of evidence to connect him with the crime unless it be that he had been in Clinton and had departed from there on the night it was committed. Theodore E. Long, Clinton police captain, and Edward Clancy, identification officer, who were most active in the investigation, concede this, and the record would thoroughly demonstrate it if they did not. We have held, following the majority rule, that if the commission of a crime by someone is shown, a confession alone is sufficient to sustain a conviction, although there is no other evidence connecting the confessor with the crime. State v. Saltzman, 241 Iowa 1373, 44 N.W.2d 24; State v. Webb, 239 Iowa 693, 703, 31 N.W.2d 337. But when the confession is the sole link connecting the defendant with the offense committed, the reason for making sure such confession is fairly obtained, without threats, duress, coercion, promises, or undue pressure—that is, that it is entirely voluntary in every way—most clearly appears. It is always improper to admit involuntary confessions, but far greater and graver injustice is done when there is no other evidence pointing to the accused than when his guilt is shown, to some extent at least, by other proof.

1050

The defendant having been laid by the heels by the Casper police in the informal manner above-described was questioned to some extent on the evening of February 20. The next day there was further questioning by the chief of police and by other officers. It was on this day he was first advised he was being held on suspicion of murder, or perhaps for questioning in connection with a murder. He readily signed a waiver of extradition at this time, although there was no charge pending against him anywhere upon which an extradition could be based. But, as will be later shown, defendant is not a man well versed in the law, or having any adequate understanding of his legal rights. Nor was he advised at any time, by anyone, of his right to counsel and to have a charge filed and a prompt arraignment.

The foregoing facts, and those which are referred to later, are not in dispute. Most of them have been taken from the testimony of the various police officers called by the State. We recognize the rule that the defendant's right to have purported confessions excluded must rest upon matters not challenged in the record, and that if there is contradiction, or if the minds of reasonable men might differ upon undisputed facts, the question of voluntariness is for the jury. Gallegos v. Nebraska, 342 U. S. 55, 72 S. Ct. 141, 145, 96 L. Ed. 86, and many other cases enunciate this doctrine. But the essential facts here are not disputed and we think clearly show the error in the admission of the confessions hereinafter referred to.

After the defendant was summarily thrown into jail on the evening of February 20 he was again questioned on February 21 and February 22 by the Casper police. These gentlemen had been furnished with the known facts concerning the murder of Mrs. Chapman and the Clinton police theory as to how it was committed. On February 23 the county attorney of Clinton County and Police Captain Long arrived. The questioning on this date started shortly after seven o'clock in the evening and continued with relays of officers taking part until 11:30 or twelve o'clock, when the defendant finally agreed to tell them the story they wanted. Captain Long and Casper officers made up the first "team"; then Mr. Eggers, the Clinton County attorney, took over; then Long, with officers Tony Wroblewski and C. J. Carter of the Casper department came in again. During the approxi-

mately four days of questioning by various officers the defendant maintained his innocence. But, at least on the night of February 23, as to which we have more detail, when his story did not accord with the wishes of the officers, he was told he was not telling the truth, or that he was lying, and it was repeatedly demanded that he admit the murder. It must have been apparent to him, as it is to a reader of the record in the case, that no other answer would satisfy the inquisitioners. At length, about 11:30 p.m., the defendant, after being repeatedly accused of falsification when he denied any knowledge of the crime, said: "If I tell you I did this, will you let me get some sleep?" Officers Long, Wroblewski and Carter all testify to this.

The defendant then told a story which did not fit the officers' theory of the case and they told him it was not satisfactory. The Casper officers had been advised by letter of the known facts in the case, and during all the questioning they and the Clinton authorities repeatedly challenged defendant with them. The confession which he finally signed, State's Exhibit 15, was written by Mr. Eggers; and the second one, Exhibit 16, which at the demand of the officers defendant wrote himself with Exhibit 15 lying on the table beside him, is quite evidently a résumé of the first.

Still with no formal charge filed against him anywhere the defendant was taken upon the train and returned to Clinton where the party arrived on the night of February 25. Here a special state agent appeared upon the scene. At 11:30 that night the defendant was taken by the assorted officers to locate the scene of the crime and point out various details. These must have been well known to him by that time through the repeated questionings, the pictures which the Clinton officers say they took to Casper with them to confront him, and the confessions prepared by the county attorney. It is significant that in matters concerning which the authorities had a theory as to the manner of commission of the crime, such as the use of the brake shoe key and the attempted but incompleted rape—as to neither of which is there any real evidence—the confessions agree. They follow the theories of the officers. But where there was no theory, and therefore no suggestion, the confessions do not accord with demonstrable facts. Thus, the confessions say the defendant met,

or saw, Mrs. Chapman in a restaurant about midnight on the night of the crime and followed her from there. Yet the proprietor of the café and a waitress who was on duty that day say, without contradiction, the place closed at eight p. m.

On February 26, after being held since February 20, a charge of murder was finally filed against the defendant. Section 758.1, Code of 1950, provides: "When an arrest is made without a warrant, the person arrested shall, without unnecessary delay, be taken before the nearest or most accessible magistrate in the county in which the arrest is made, and the grounds on which the arrest was made shall be stated to the magistrate by affidavit, subscribed and sworn to by the person making the statement, in the same manner as upon a preliminary information, as nearly as may be."

Section 759.14 of the same Code, a part of the Uniform Criminal Extradition Act, which was likewise in force in Wyoming at the time, is this: "The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in the preceding section; and thereafter his answer shall be heard as if he had been arrested on a warrant."

I. The defendant had gotten as far as the sixth grade in school. He had served time as a juvenile for petty theft, had several arrests for vagrancy and drunkenness, and had a conviction for automobile theft on which he had served three and one-half years. It was immediately following this that he changed his name from George Raymond Archer to Jack O'Day, by which name he had been known in Clinton and in Wyoming. There is no record of any crime of violence or of one involving sex. He says: "I was in trouble now and then * * * and I always plead [sic] guilty and served my time." Dr. Marcus B. Emmons, a doctor of psychiatry and neurology, after examining the defendant, testified without contradiction that he is a "constitutional psychopath." He described this type of individual as

knowing reality, but being emotionally unstable, tending to be nomadic, having irregular work records, improvident in financial affairs and with little thought about providing for the future. Doctor Emmons said such a person would not stand up against odds as long as the average individual; if repeatedly called a liar or told he was not telling the truth he would give in more quickly to the person questioning him and would be pushed into admitting facts not true sooner than the average person; he would yield more readily, and if the line of questioning were changed he would "go along" with the new line.

The known facts of defendant's life tend strongly to corroborate Doctor Emmons' analysis. He is quite evidently one of Nature's misfits. He has wandered from place to place during his life, following the western harvests at times and making his precarious living at others as an itinerant farm laborer or odd-jobman. His frequent transgressions against the law, all minor except for the one automobile theft, taught him nothing except that it was best to plead guilty. It is apparent the law was, to him, an irresistible force against which it was useless to contend. A man of stronger will and determination might have resisted the pressure of the officers longer. But the defendant had not the fortitude to do so. Whether he is guilty of the crime charged we do not know; but a majority of this court is convinced it would be a standing reproach to the administration of justice if he should stand convicted upon the sort of record made here. The officers who held him in custody in Wyoming were violating their own statute—a general one in the United States—which required the accused be taken promptly before a magistrate and informed of the charge against him. He was held in custody without legal right, and in spite of the signing of the extradition waiver was returned to Iowa without legal right. During the time he was held he was subjected to repeated inquisitions. No claim is made that any physical violence was used. But, friendless and without counsel, and without advice he was entitled to counsel, he was incarcerated and accused; and when he denied his guilt his reward was that he was called a liar and adjured to tell the truth. It was a logical conclusion, particularly to one of his low mentality, that he would escape from

the questioning, the "badgering", the "sweating", only by giving his inquisitioners the answers they demanded. They questioned him in relays, taking time to rest while others carried on, but on the night of February 23 no rest was given defendant. He had no substitute, no second "platoon."

Of a similar situation the Supreme Court of the United States has said: "A statement to be voluntary of course need not be volunteered. But if it is the product of sustained pressure by the police it does not issue from a free choice. When a suspect speaks because he is overborne, it is immaterial whether he has been subjected to a physical or a mental ordeal. Eventual yielding to questioning under such circumstances is plainly the product of the suction process of interrogation and therefore the reverse of voluntary." Watts v. State of Indiana, 338 U. S. 49, 53, 69 S. Ct. 1347, 1350, 93 L. Ed. 1801, 1806. In the concurring opinion of Mr. Justice Douglas in the same case, at page 57 of 338 U. S., page 1351 of 69 S. Ct., is this comment, which seems to us peculiarly applicable to the activities of the officers here: "It would be naïve to think that this protective custody was less than the inquisition. *The man was held until he broke.* Then and only then was he arraigned and given the protection which the law provides all accused." (Italics ours.)

In Haley v. State of Ohio, 332 U. S. 596, 68 S. Ct. 302, 303, 92 L. Ed. 224, a fifteen-year-old boy was questioned from shortly after midnight for about five hours, by relays of police, with no friend and no counsel for the accused present. At the end of that time he signed a confession which started with the statement, as do those involved here, that it was voluntary and made of his own free will without threats or promises. The Supreme Court of the United States said, at page 599 of 332 U. S., page 303 of 68 S. Ct.: "We do not think the methods used in obtaining this confession can be squared with that due process of law which the Fourteenth Amendment commands." Again, on page 600 of 332 U. S., page 304 of 68 S. Ct. is this: "The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police toward his rights combine to convince us that this was a confession

wrung from a child by means which the law should not sanction. *Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law."* (Italics ours.)

Conceding that the subject in the cited case was an immature youth, we think it cannot justly be distinguished from the case at bar. The defendant here was of such limited intelligence and will power as to make the confession wrung from him equally suspect.

Other cases in the United States Supreme Court have held confessions inadmissible because they were obtained under circumstances clearly indicating a denial of due process, in violation of the Fourteenth Amendment to the Constitution of the United States. Many of them are listed in the notes at the bottoms of pages 50, 51 of 338 U. S., and pages 1348, 1349 of 69 S. Ct., supra.

The situation here is much like that described by Justice Weaver in State v. Thomas, 193 Iowa 1004, 1013, 188 N.W. 689, 693, in these words: "Held by these officers in a room to which no friend of the defendant's was admitted, he was subjected to four hours of rigorous and determined interrogation. Over and over again he denied all complicity in the alleged crime, only to have his statements rejected as false, and met with the insistent demand upon him to confess. True, the officers say they did not, in so many words, demand a 'confession', but that they were simply demanding that he tell the truth. This, however, is only a play upon words; for his assertion of what he claimed to be the truth was met by constant repetition of a demand which implied that he was telling a falsehood, *and that no answer would be satisfactory which did not admit his guilt."* (Italics ours.) At length the defendant therein said, much as in the case at bar, " 'I did not do it, but I will say I did.' "

In People v. Borello, 161 Cal. 367, 374, 119 P. 500, 503, 37 L. R. A., N. S., 434, 437, the method of obtaining confessions used in the instant case was condemned by the California Supreme Court in these words: "But it is these very questions put by the sheriff and district attorney, the continuous and searching examination to which the defendant was put by both of them in an

endeavor to wring out a confession when it was apparent that he was not disposed to make one, and their statements and conduct toward him, which showed that the confession was not freely and voluntarily made * * *."

In People v. Quan Gim Gow, 23 Cal. App. 507, 511, 138 P. 918, 919, the court said: "While no physical force was used, and neither threats nor promises made, there can be no doubt at all but that the repeated questioning of the officers, like the constant dropping of water upon a rock, finally wore through his mental resolution to remain silent."

This excerpt and the one from the Borello case set out above are quoted with approval in State v. Thomas, supra.

Turner v. Commonwealth of Pennsylvania, 338 U. S. 62, 65, 69 S. Ct. 1352, 1353, 93 L. Ed. 1810, 1813, is much like the instant case in its facts. There Turner was picked up, without charge or warrant, on June 3, 1946, and held by police of Philadelphia until June 7, when a confession was finally obtained. No threats or promises were shown. The state courts found the confession to be voluntary, but the Supreme Court of the United States reversed, holding it inadmissible as a matter of law. After pointing out that the defendant was not permitted to see friends or relatives during the period of custody, was not informed of his right to remain silent until after he had yielded to the interrogation, and that the delay of five days in filing a charge was in violation of Pennsylvania law, the court said "[there is] open no other possible conclusion than that petitioner's confession was obtained under circumstances which made its use at the trial a denial of due process."

The question of violation of the Fourteenth Amendment to the Constitution of the United States and of the due process clause (Article I, section 9) of the Iowa Constitution was raised throughout the trial by defendant's counsel; and error is assigned, upon the admission of the confessions, upon the same ground upon this appeal. The matter for our determination is, of course, whether the undisputed facts show a denial of due process as a matter of law. To put it in another way, were the confessions obtained by methods which make it clear they were not fully and freely voluntary? If so, their use was a violation of the due process clauses of both Federal and State constitu-

tions. It seems to the majority of this court that the record of
what was done to the defendant in this case brings the definite
conclusion that his rights were flagrantly violated, and the most
serious doubts the confessions were in any sense voluntary. The
defendant simply gave up what seemed to him an unequal
struggle. He was being held illegally, and there seemed every
indication it was the intention of the officers, sworn to uphold
the law but who were actually and effectively flouting it, to hold
him and to continue their questioning until he told them what
they wanted to hear. True it is that peace officers, and prosecut-
ing attorneys, must have some latitude in law enforcement, but
we cannot think they are serving the ends of justice by methods
such as these. Perhaps the officers were merely overzealous, but
it would be a gross miscarriage of justice to support a conviction
only by confessions obtained by such pressures, applied while the
officers were themselves in the commission of illegal acts. Again
we quote from State v. Thomas, supra, pages 1020, 1021 of 193
Iowa, page 695 of 188 N.W.:

"But it is not within the province of the public prosecutor
or sheriff or policeman or detective or of all of them together to
assume the guilt of a person not under arrest, for whose appre-
hension they hold no writ, and restrain him of his liberty or
subject him to the indignity of inquisitorial examination, and
grill him by methods which pertain to that modern instrument
of torture known as the 'sweat box.' The mere fact that those
who assume such authority and engage in such practices are
public officers does not exonerate them from the charge of violat-
ing the law of which they are the sworn defenders, or differenti-
ate them in any legal sense from the mob. If the sheriff and
county attorney in this case had reasonable ground to believe
defendant was guilty of the crime charged, it was, as we have
already indicated, within the scope of their duty and authority
to arrest him and produce him before the magistrate, where an
examination could be had in an orderly and lawful way, and
the rights of the State on the one hand and of the accused on
the other could be properly protected. Instead of this, they
constituted themselves a tribunal unknown to the law, and pro-
ceeded without warrant to subject the man to a secret examina-

tion, from which his friends and his counsel were carefully excluded. They assumed his guilt, and refused to credit his denials and his protestations of innocence or to accept anything he might say in his own behalf until they had extorted from him the alleged confession. Such proceedings are without excuse or justification; and to tolerate them or to ignore them without rebuke is to bring reproach upon the law and to convert the administration of justice into an engine for the perpetration of rank injustice."

 Of course, the fact that a suspect has been held illegally without charge or arraignment does not in itself make a confession involuntary and so a violation of due process, although in the Federal Courts such a confession is not admissible as a matter of practice. Gallegos v. Nebraska, supra; McNabb v. United States, 318 U. S. 332, 340, 63 S. Ct. 608, 612, 87 L. Ed. 819. Such a situation is, however, one of the indicia of undue pressure. If in addition there appears no attempt to advise the defendant of his right to counsel or of his right to remain silent; a systematic course of reprobation by meeting every denial of the crime with the accusation of untruthfulness and a demand that the accused "tell the truth" when it is evident that only an admission of the commission of the crime will be accepted as the truth; and a continuance of this course of treatment for several days, we think it would be an exceptional case when involuntariness does not appear so clearly upon the face of the record as to require denial of admittance of the confession in evidence.

It is urged that we are not concerned with the guilt or innocence of the defendant; that that matter is for the jury. Only in a limited sense is this so. It is the great purpose of our jurisprudence that law and justice should be synonymous. When they seem to be following divergent paths the wise jurist will re-examine his authorities and his reasoning with the utmost care. When he does so he will generally find the separation is apparent rather than real and that a proper application of legal principles will show them to coincide.

The defendant was summarily seized and held in jail, without any opportunity to secure help. That he arrived at

the conclusion, after four days of illegal incarceration and questioning, he was helpless in the grasp of a force which would be satisfied with nothing less than his surrender to its demands he admit his guilt, should occasion no surprise.. It seems evident, also, that the officers and the county attorney went at their task of securing a confession without much, if any, real reason to believe the defendant guilty, and the idea of the confessions was not his, but theirs. In Gallegos v. Nebraska, supra, page 71 of 342 U. S., page 150 of 72 S. Ct., Justice Jackson points out a significant distinction between that case and those in which the confession is sought after so that it may be said to be induced by the inquisitors. In the Gallegos case it was held that there was no such denial of due process as to require the interference of the United States courts. Justice Jackson, in a concurring opinion, said:

"It is not even clear that they accused Gallegos of murder and certainly *they had no theory of a crime which they were trying to support by obtaining a confession. * * * These are not confessions obtained. to fit the facts known to the officials.* * * Nor is it a case where the confession was altered or embellished in a prolonged process of examination." (Italics ours.)

We have here the obverse side of the coin. The officials *did* have a theory which they were trying to support by obtaining a confession; the confessions *were* obtained to fit the facts known to the officials. That the defendant was one of life's derelicts whose make-up was such that their task was made lighter is an incident only; the methods used would have been equally reprehensible, equally destructive of the voluntariness of the confessions no matter against whom employed. Perhaps it would be putting it a shade too strongly to say a confession should be, like Caesar's wife, above reproach; and yet, particularly when a capital crime is involved, and it is the only evidence connecting the defendant therewith, it should be free from any taint of unfair dealing or undue pressure by the prosecuting authorities. Such freedom does not appear here; on the contrary, it is evident that the confessions were obtained by denial of the rights of an ignorant man, of weak mentality and will power, by unfair pressure put upon him.

■ The confessions start with the statements that no promises or threats had been made; that the defendant knew he did not have to make any statement, and Exhibit 15 says it is made "of my own free will and accord." These add nothing to them when the facts under which they were obtained are undisputed or shown by the State's own witnesses, as here. We said in State v. Thomas, supra, 193 Iowa at page 1021, 188 N.W. at 696: "If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the State, by its own evidence, negatives these essentials to its use in evidence, it is the duty of the court to sustain the objection and refuse its submission to the jury."

It would be a mockery to say that because such words were inserted in a confession, when all the facts show it to be involuntary, some doubt sufficient to raise a jury question was thereby engendered. The same vice which taints the entire confession will strike down language asserting its giving as the free will of the accused. Such a statement, or a similar one saying that the confessor knows he is not compelled to make any statement, is denied by the very facts themselves. The same influence which induces the making of the confession will likewise cause the statement that it is freely and voluntarily made. An admission of voluntariness, when voluntariness is negatived by admitted facts, adds nothing to an otherwise clearly inadmissible confession. Both Exhibits 15 and 16 should have been denied admission into evidence.

■ II. We have referred to the fact that, within a few hours after the defendant was returned to Clinton, before any charge was filed and while he was in the custody of the same officers, with additions, who had induced the confessions at Casper, the defendant was taken to the scene of the crime and to other locations, such as streets and buildings, named in Exhibits 15 and 16. He identified these places, or some of them, as he says, from the descriptions given him through the prolonged questioning, some photographs, and the confession written by the county attorney. Whether this be so or not we think the same taint runs through these admissions as through the confessions. The defendant having once been "broken", the

second confession and whatever admissions he made on the trip about Clinton on the night of February 25 followed logically and as a result of the same improper influence. He was still held illegally, there was still no charge filed, he was under the same pressures, and he was still without advice of counsel. This evidence was equally inadmissible. State v. Chambers, 39 Iowa 179, 183, 184.

 III. After the confessions (Exhibits 15 and 16) had been obtained, the officers at Casper, on the same night, secured still a third one. This was reproduced upon a wire recording. The trial court refused to admit it in evidence and the State has appealed from this ruling. This appeal is without merit. The confession would be inadmissible for the same reasons as Exhibits 15 and 16; but we need not place our holding upon that ground. Section 793.2, Code of 1950, says: "An appeal can only be taken from the final judgment * * *." There was here no final judgment adverse to the State, and so nothing from which it had the right of appeal.

Other errors urged by the defendant are not likely to arise upon a retrial, if one is had, and so are not discussed.—Reversed and remanded upon defendant's appeal; dismissed upon the State's appeal.

BLISS, OLIVER, MULRONEY, and HAYS, JJ., concur.

WENNERSTRUM, J., dissents and SMITH, C. J. and GARFIELD, J., join.

LARSON, J., takes no part.

WENNERSTRUM, J. (dissenting)—I cannot concur in the majority opinion as I do not believe the confessions were inadmissible as a matter of law or that there was insufficient evidence to support the verdict. Nor do I find support in the record for the harsh terms—"inquisition", "inquisitioners", "badgering", "sweating", and a "second platoon"—indulged in by the majority. It was, I think, for the jury to determine whether there was any undue pressure put upon defendant in obtaining his confessions.

I. The majority holds the due process clauses of the Federal and State Constitutions were violated in obtaining the confessions. With this conclusion I am not in accord. In fact

the majority indicates it is not sure of its conclusion for its opinion states:

"It seems to the majority of this court that the record of what was done to the defendant in this case brings the definite conclusion that his rights were flagrantly violated, *and the most serious doubts the confessions were in any sense voluntary.*" (Italics supplied.)

In State v. Thomas, 193 Iowa 1004, 1021, 188 N.W. 689, 696, from which the majority quotes extensively, this general rule relative to the voluntary character of a confession is set forth: "* * * but it is settled in this state that, where the free and voluntary character of the statements relied upon as a confession is the subject of dispute or conflict in the evidence, the question may properly be submitted to the jury. *State v. Storms,* supra; *State v. Bennett,* 143 Iowa 214. If, however, it clearly appears from the record that the alleged confession was not freely and voluntarily made, or if the State, by its own evidence, negatives these essentials to its use in evidence, it is the duty of the court to sustain the objection and refuse its submission to the jury. *State v. Chambers,* 39 Iowa 179; *State v. Jay,* 116 Iowa 264."

There was a much stronger showing as to the involuntary character of the confession in the Thomas case, supra, than we have here. The Thomas confession was made under fear of violence from a mob assembled in the immediate vicinity after defendant's attorney had asked and been refused entrance to the house where the interrogation was in progress.

We can advisedly apply the facts in this case to the rule quoted from the Thomas case. In State's Exhibit 15 the appellant stated: "* * * no promises have been made to me by any police officer or anyone else or have I been threatened with any personal injury. I make this statement of my own free will and accord, knowing that I do not have to make any statement." This same statement was incorporated in Exhibit 16 which the appellant wrote in his own handwriting. The fact that this second confession was written by the appellant does not indicate he was so devoid of mentality he could be and was easily in-

fluenced by his interrogators. It appears to the writer of this dissent that the writing of his own confession is a circumstance that could be considered by the jury as bearing upon the voluntary character of the confession. The jury could also consider this fact in its determination of the appellant's mentality.

In further support of the conclusion that the jury should determine the character of the confessions, we find the following testimony of the appellant in his cross-examination: "Q. Is there any time you were being questioned out there that you were threatened? A. By Mr. Long, no. Q. And by anyone else out there? A. No. Q. Was there any time out there, Jack, that anyone out there made you any promises? A. No. Q. Now, Jack, you state that these statements were suggested to you? A. More or less, in a way. Q. By the officers? A. By the questioning. Q. What? A. By their questioning. Q. But they were finally voluntarily made by you, is that true? A. I signed the things to get some peace and rest, that is why. Q. *You signed them voluntarily? A. Yes.*" (Italics supplied.)

Further facts are disclosed in the cross-examination of the appellant: "Q. Jack, do you remember when we were sitting in the train coming out of Wyoming? A. I remember. Q. You and I were sitting in a seat together? A. Yes. Q. What did you say? A. I said a lot of things; what are you pertaining to? Q. I am pertaining to when you said, '*I want to go into court and get this over with as quick as I can.*' A. *I said that.* Q. And when we were coming up after you re-enacted the crime, you were sitting with Ted Long in the back of the car with Mr. Strand? A. Yes. Q. Do you remember you talked to Ted, what did you say? A. I don't remember but you seem to know it, so——Q. Didn't you tell Ted, 'Can I get into court tomorrow and get this over with?' A. No, I didn't say that. Q. That isn't true? A. No. Q. But you told me that on the train coming out of Wyoming? A. If I said it I don't remember it. *Q. You just got through telling me you did? A. All right, I said it.*" (Italics supplied.)

II. The majority lays particular stress on several pronouncements of the Supreme Court of the United States. For a distinction between the federal rule expressed in the McNabb

case, 318 U. S. 332, 346, 63 S. Ct. 608, 87 L. Ed. 819, and other supreme court opinions and the rule followed in many states, see annotation in 19 A. L. R.2d 1336–1347 and cases therein cited. In this annotation at page 1336 it is stated:

"With few exceptions, the state courts have refused to apply the strict rule established by the McNabb Case, although the decision has been discussed in the majority of subsequent cases involving the question of the admissibility of confessions obtained during a period of delay in arraignment.

"In a number of cases, the state courts have continued to hold admissible confessions made by an accused whose arraignment was delayed in contravention of statute, and, on the ground that the McNabb decision is not binding upon state courts, have expressly refused to apply the doctrine laid down in that case."

It should be kept in mind that in the McNabb case a federal statute was applied. It is apparent the majority has ignored the many state decisions referred to in the annotation previously cited wherein it has been held the federal rule is not applicable.

It is appellant's contention that the repeated questioning of him prevented his obtaining necessary rest. We believe there is a definite conflict in the testimony whether the appellant's confessions were improperly procured. Under our prior holdings it was proper to admit them in evidence and to submit the question of their voluntary character to the jury. State v. Hofer, 238 Iowa 820, 829, 28 N.W.2d 475, 480; State v. Thomas, 193 Iowa 1004, 1021, 1024, 188 N.W. 689. See also 20 Am. Jur., Evidence, section 533. The confessions themselves show they were voluntarily given.

The fact that the appellant was fatigued when a confession was given does not necessarily render it inadmissible. State v. Hofer, supra, at page 828. And in the McNabb case, supra, it is held that the mere fact a confession was made while in the custody of the police does not render it inadmissible. See also State v. Hofer, supra, at page 827. And we have also held that the fact a confession was given while one was under unlawful arrest does not make it involuntary. State v. Westcott, 130 Iowa 1, 6, 104 N.W. 341. Appellant's testimony upon this point neces-

sarily creates a conflict for the jury to decide and does not require the exclusion of the exhibit. State v. Kress, 204 Iowa 828, 832, 216 N.W. 31; 22 C. J. S., Criminal Law, section 838, page 1470.

III. The majority also comments on the admission of evidence relative to the re-enactment of the crime. In connection with this claimed error attention is called to the fact that shortly after the appellant returned from Wyoming he was asked if he would point out certain locations in Clinton that he had mentioned in the confessions given in Casper. According to a State witness the appellant said he would be glad to do so. A review of his testimony does not disclose a denial of this statement. There is nothing in his testimony to indicate he was taken against his will to the places connected with the alleged crime. However, it is contended by the appellant's counsel he was denied his constitutional rights by the admission of evidence relative to this trip and the statements made by the appellant at that time, that his actions during the trip to the place of the alleged crime were involuntary and that this evidence should have been stricken. There is no evidence to show that his actions were in any manner the result of compulsion.

In State v. Benson, 230 Iowa 1168, 1173, 300 N.W. 275, 277, we commented on the admissibility of evidence relative to the conduct and demeanor of a defendant and stated: "It is proper to show the defendant's conduct, demeanor and statements (not merely self-serving), whether oral or written, his attitude and relations toward the crime, if there was one. These are circumstances that may be shown. Their weight is for the jury to determine.

See also State v. Bryant, 208 Iowa 816, 818, 225 N.W. 854. And in 2 Wharton's Criminal Evidence, section 647, it is stated: "Any statement made by a defendant, even though not admitting the commission of the crime charged, is competent against the party making it if it throws any light on the issue being tried and elucidates the subject-matter of the trial."

In connection with the matters heretofore stated we have this testimony of G. M. Strand, a special agent of the Iowa Bureau of Criminal Investigation:

"During this time no one suggested to the defendant where to go. After arriving on the north side of 12th Avenue South, we proceeded west on foot across the intersection of 12th Avenue South and 5th Street and on west of the intersection until we came to a location between two houses. The defendant hesitated and said he would like to walk on west so we walked west two or three houses and he stopped and stated, 'that was too far', and then returned to the location next to 518 Twelfth Avenue South and said, 'this is the place.' We then proceeded between the two houses to the rear property line of this residence at which point he pointed to the ground and stated that was the location that he had assaulted the deceased and the position in which he had left the body. He said he was frightened and saw a lantern, and the question was asked, 'where did you see the lantern?' And he said, 'down there', and pointed to the west. That was a straight alley to the west. The defendant then proceeded back to the street the same route he had used coming to the alley. He then went west to the end of the street, cut diagonally across the street and headed toward the railroad yards, and in so doing, he skirted a bulk station there and pointed to the ground near the fence separating the bulk station from the street and said, 'that is where I threw the brake shoe key', and that he proceeded on into the railroad yards and left town. * * * ."

Inasmuch as the majority states that except for the confessions "there is no syllable of evidence to connect him with the crime unless it be that he had been in Clinton and had departed from there on the night it was committed", it is significant that we have this testimony of Mr. Strand: "He said he was frightened and saw a lantern, and the question was asked, 'where did you see the lantern?' And he said, 'down there', and pointed to the west." This incident had not been referred to in the confession and it is apparent that none of the officers knew of this fact at the time the appellant was questioned in Casper. The statement attributed to the appellant was not denied by him in his testimony. It is also significant that there is testimony there were men near the end of the alley on the night of the crime with flashlights looking for night crawlers. It is apparent

therefore that there is undenied evidence other than the confessions connecting appellant with the crime.

The jury also had a right to appraise the credibility of appellant's explanation that his knowledge of the area which he identified as the alleged scene of the crime was obtained merely from a diagram and pictures shown him several days earlier in Casper, Wyoming. The jury might easily find such intelligence and memory quite inconsistent with his claimed lack of intelligence in other ways.

IV. The majority refers to the State's appeal in connection with the offer of the wire recording confession. With the conclusion that the State has no right to appeal, I have no quarrel. However, I feel this confession should have been admitted in evidence. It was another circumstance which the jury could have considered as bearing upon the voluntary character of all the confessions. In this confession it is disclosed that the appellant was asked if he wished an attorney and he replied he did not. It should be kept in mind that in the case of State v. Benson, supra, which is referred to in Division III of this dissent, we held that facts bearing upon a defendant's demeanor and conduct could be properly considered by a jury. This holding has application in connection with the admission of the wire recording.

If the wire recording was erroneously excluded it is our duty to consider it in passing on the sufficiency of the evidence. Iowa Electric Co. v. Home Ins. Co., 235 Iowa 672, 676, 677, 17 N.W.2d 414, 416, and citations; Sjulin v. Clifton Furniture Co., 241 Iowa 761, 768, 41 N.W.2d 721, 726.

V. The majority gives particular weight to the testimony of a doctor of psychiatry and neurology. I believe courts should endeavor to benefit from the sciences in the administration of justice, however, in doing so we should not discard established principles of law. If the defense of insanity had been raised it would have been left to the jury to determine the appellant's mentality. State v. Berry, 241 Iowa 211, 40 N.W.2d 480. How then can we say that in this case the testimony of the psychiatrist should not have been for the consideration of the jury in determining whether the appellant was easily influenced? The ques-

tion of mental cómpetency has generally been held to be for the jury if there is a material conflict in the evidence. State v. Berry, supra. Surely it cannot be said there was no such conflict in the instant case.

VI. It would appear the majority has failed to keep. in mind our accepted rule that in determining the sufficiency of the evidence to take a criminal case to the jury the testimony must be considered in the light most favorable to the prosecution and only the evidence tending to support the conviction need be considered. State v. Rutledge, 243 Iowa 179, 184, 47 N.W.2d 251, 255, and citations; State v. Hill, 239 Iowa 675, 32 N.W.2d 398, and citations. It is my considered opinion there is sufficient evidence to justify the submission of this case to the jury. By a reversal the majority has substituted itself for the jury.

I would affirm.

SMITH, C. J., and GARFIELD, J., join in this dissent.