STATE of Iowa, Appellee,

v.

**Laurence Paul HOLDERNESS, Appellant.**

**No. 54407.**

Supreme Court of Iowa.

Nov. 11, 1971.

Rehearing Denied Jan. 12, 1972.

Willard M. Freed, Iowa City, for appellant.

Richard C. Turner, Atty. Gen. Michael J. Laughlin, Asst. Atty. Gen., and John Hayek, Asst. County Atty., for appellee.

BECKER, Justice.

Defendant was charged by county attorney's information with the crime of murder. Jury trial resulted in verdict of guilty of murder in the second degree. He was sentenced to 50 years imprisonment. He appeals. We affirm.

On July 6, 1968, at about 7:30 a. m., Mary Stanfield, an elderly lady who lived alone in her home in Iowa City, was found dead on her living room floor. She had been beaten on the head with a fairly sharp instrument. The autopsy showed she had been struck seven times. Three of the blows penetrated the skull. Medical witnesses indicated she lived about eight hours after the injury and had been dead about

eight hours before being found. Although Dr. Cross initially reported the time of injury as occurring between 7:00 p. m., July 5, and 1:00 a. m., July 6, this evidence was characterized as an estimate by the doctor. He also opined that the injuries could have been inflicted as early as 2:00 p. m. the previous day.

The neighbors testified to Mrs. Stanfield's habit of sitting in her yard in a favorite lawn chair; she always put the chair away in the late afternoon when she was finished using it. The shades in her living room were ordinarily up to allow the flowers in the windows to grow. At night she always used the drapes rather than the shades.

Mr. Fuhrmeister, a neighbor, came home to lunch at about 1:10 p. m. on July 5, 1968. The chair was out in the lawn but Mrs. Stanfield was not in sight. Defendant's 1957 Chevrolet was in the Stanfield yard. At about 1:45 p. m. when Mr. Fuhrmeister left for work the conditions remained the same. When he returned from work defendant's car was gone but the chair remained in the yard. The shade was pulled down so that it rested on one of the flowers on the window sill. The newspaper usually delivered at 5:00 p. m. was on the porch. After dark Mr. Fuhrmeister walked part way down the bank and looked into the house. He could see that the television set was on. The blind was still drawn and bending one of the flowers.

The next morning the chair was still in the yard and the shade was still drawn. Mr. Fuhrmeister investigated. He discovered the body on the floor in the living room and called the police.

From the foregoing and other similar testimony the jury could find that Mrs. Stanfield was beaten sometime between 2:00 p. m. and 5:00 p. m. on July 5. Although this was not within the range of the doctor's first estimate, it is within the range of his testimony.

The inquiry immediately focused on defendant. He knew the deceased well, visited her quite often and his car was seen at Mrs. Stanfield's home at about the time Mrs. Stanfield was last seen alive. Defendant had left Iowa City for Granbury, Texas, to visit with a cousin named Lowell Holderness. He had indicated to at least two people that this was his plan. On July 10, he called his employer's home from Texas. Mrs. Conklin, the employer's wife, reported the call to the police. He was arrested in Texas by Federal Bureau of Investigation officers.

Detective Snider and County Attorney Robert Jansen went to Texas to question defendant. They obtained a written confession from him. Subsequently he was returned to Iowa City where he was tried and convicted.

Defendant assigns the following errors as basis for reversal:

1. Defendant's motion to supress his statements and confession should have been sustained because of (a) failure to fully and completely inform him of his constitutional rights, (b) the statements were inconsistent with the physical facts, (c) defendant's mentality and the surrounding circumstances were such as to demonstrate that he was incapable of voluntarily waiving his constitutional rights.

2. A verdict should have been directed because there was no corroboration of defendant's confession.

3. Instructions dealing with assault with a deadly weapon were erroneous because the weapon was not produced in evidence.

4. Use of a transcript of the prior evidence of Dorothy Fuhrmeister was prejudicially erroneous.

I. Defendant first contends the State failed to sustain its heavy burden to prove compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

When Detective Snider and County Attorney Jansen questioned defendant he had already been charged by preliminary information with murder and was being held under warrant. He was questioned in the Tarrant County, Texas, courthouse which also housed the jail. The interrogation was held in the office of a sheriff's deputy. The office was described as a basement room containing a desk, chairs, filing cabinets, windows, drapes, tile floor—a typical office.

The interrogation began between 8:00 and 8:30 a. m. By 11:28 a. m. the first statement had been made orally, reduced to writing and signed by defendant. Defendant was given a 30 to 45 minute lunch break, absent his interrogators, and the questioning then continued. The second statement was made, reduced to writing and signed by 1:30 p. m. Defendant does not indicate that any duress, coercion or threats were used.

Detective Snider first talked to defendant alone. He testified he gave the Miranda warning to defendant by reading both sides of a card which is in evidence. He asked defendant, " 'Do you understand these rights and are you willing to waiver these rights at this time and talk to me,' he said, 'yes, sure I'll talk to you.' " Defendant then gave a statement in which he claimed he left Iowa City the evening of July 4 and did not return; i. e., he wasn't in Iowa City the day of the murder. County Attorney Jansen was called in, the statement was reduced to writing and defendant signed it.

After lunch Detective Snider again interviewed defendant alone and accused defendant of lying. After further conversation defendant gave a second statement in which he admitted being at Mrs. Stanfield's on July 5 and striking her on the head with a tire iron during an argument on the afternoon of July 5, 1968.

Between them Detective Snider and County Attorney Jansen testified they issued the Miranda warnings at least four times. The first warning was given by Detective Snider at the very beginning of the interrogation. At this time defendant signed a written waiver. Three more warnings were given during interrogation.

Defendant took the stand in his own behalf. He denied that the full Miranda warnings had been given, denied he had been told he could have an attorney and denied he had told the officers what they said he had told them; i. e., the material contained in the two statements. He affirmatively stated he could neither read nor write (except his name and enough to fill out credit card chits at the filling station job he had before going to Texas). He did not know what he was signing when he signed the waiver and only one side of the warning card had been read to him. He also affirmatively states that he asked for his attorney, Mr. Freed, several times during the interrogation but was put off.

Defendant's position is corroborated in three aspects. The officers agree that defendant could neither read nor write. A competent psychiatric evaluation places him at borderline subnormal intelligence (I. Q. Wechsler Adult Intelligence Scale 77). Dr. Douglas Johnson further stated:

"Q. Doctor, in your opinion, if Laurence Holderness thought, for example, that he would get something such as a ride from Texas back to Iowa, would he be likely to sign a statement that's not true to obtain such a result? A. If this was what he wanted at the time and he thought that he could get it, he might well do such a thing. As a matter of fact, I think he probably would.

"Q. Well, Doctor, after reading Exhibit 3, would in your opinion Laurence Holderness sign such a statement on the basis if he thought that he would get something such as a ride from Texas to Iowa? A. I think he might well do so. I can certainly conceive of him doing so."

Other factors must also be considered. While defendant is undoubtedly of low in-

telligence, his work background as well as his testimony indicates sufficient intelligence to understand events as they take place. He is of sufficient intelligence to own a car, secure a driver's license and drive from Iowa to Texas unaided. He had been living alone for some time and apparently got along satisfactorily.

Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, states in part:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 [986]. This Court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), 146 A.L.R. 357, and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders.

"An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement, could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70, [77] (1962), is applicable here:

" 'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.' "

Of course, we are not faced with a "silent record" in this case. The problem is not one of nonevidence but of credibility of the evidence adduced. Defendant says he did not receive the full Miranda warnings and asked for a lawyer several times. Detective Snider, who was with defendant at all times during the interrogation, says otherwise. County Attorney Jansen corroborates the officer as to the times the attorney was present.

Our most recent case deciding a like point is State v. Niccum, Iowa, 190 N.W.2d 815 (filed October 13, 1971). In that case we also had a conflict between defendant's version of the Miranda warnings given and the version given by the police officers. Recent cases, both State and Federal, were cited and discussed. Here, as there, we were satisfied the full Miranda warnings were given to defendant.

The Niccum case, having decided the point of transmission of the Miranda warnings, continues:

"Although Niccum was properly advised of his constitutional rights by the Iowa authorities, the State had the additional burden of establishing he voluntarily, knowingly and intelligently waived his right to remain silent and his right to assistance of counsel.

"Waiver is an intentional relinquishment of or an abandonment of a known right or privilege. State v. McClelland, 164 N.W.2d 189, 195, (Iowa 1969).

"In determining whether the State has sustained its burden of establishing a valid waiver by defendant of his constitutionally protected rights in the absence of an express waiver, this court examines the totality of circumstances—the attendant facts of the case—as shown in the record. This court has applied this

test in determining similar factual issues. See State v. McClelland, 164 N.W.2d at 195, and State v. Williams, 182 N.W. 2d [396], at 401."

· Before finally indicating our decision on this aspect of the case, we should point out the dangers to the State's case in using the methods used here. The county attorney and detective put themselves in an unnecessarily difficult position. When a detective questions defendant in private, without witnesses or recording equipment, he must later rely entirely on his own inherent credibility to successfully refute defendant's version of what happened at the interrogation.

Defendant likens this case to State v. Archer, 244 Iowa 1045, 58 N.W.2d 44 (1953). We find many distinguishing facts. In Archer there was nothing to connect defendant with the deceased except that Archer was in the city of Clinton the night of the murder. Defendant was examined in shifts over a period of four days. There were strong discrepancies between his story and the known facts. The Archer case demands careful examination of confessions, particularly where there is little or no corroborating evidence. We adhere to what was there said.

■ However, each of these cases must be decided on its own facts. After considering all the circumstances shown and from our own independent examination of the record, State v. Niccum, supra, we find the statements made by defendant were properly admitted in evidence.

II. Defendant contends there was no evidence to corroborate his confession as required by section 782.7, Code, 1971. The section does not use the term corroboration. It requires "other proof." We have consistently held:

" * * * There is no suggestion in the statute that the 'other proof' must be sufficient to establish defendant's guilt 'beyond a reasonable doubt,' or even that

it must tend to prove his connection with the commission of the alleged crime. In fact, the language of the statute requires other proof of the *corpus delicti* rather than of defendant's connection with the commission of the alleged crime. (cases cited)." State v. Webb, 239 Iowa 693, 701, 31 N.W.2d 337, 341 (1948).

Cf. State v. Walkner, 248 Iowa 920, 82 N.W.2d 776 (1957); McCormick, Evidence, § 110(a), page 230 (1954). The latter authority states:

"Conceivably, this doctrine might involve some or all of three elements: first, the harm or injury embraced in the particular crimes * * * ; second, the criminal origin of the harm or injury; and, third, the criminal participation of the accused himself. Most courts hold that the requirement embraces the first two elements only."

■ We need not now consider the efficacy of the rule eliminating the third element mentioned by McCormick. Cf. State v. Archer, supra; Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954); In re State in Interest of B. D., 110 N.J.Super. 585, 266 A.2d 326 (1969), aff'd, 56 N.J. 325, 266 A.2d 303 (1970); State v. Lucas, 30 N.J. 37, 152 A.2d 50 (1959). We find there was corroborating evidence to connect defendant with the crime in the evidence of his presence at Mrs. Stanfield's home at the time the jury could find the beating occurred.

Additionally there was a statement made by defendant to a fellow prisoner while in jail, "I did hit her."

■ III. There is no merit in defendant's complaint concerning instructions relating to assault with a deadly weapon. The objections are not directed to the form of the instructions but to the contention that they should not have been given at all. There was ample evidence that Mrs. Stanfield was struck with a deadly weapon. The instructions were proper.

IV. There is also no merit to defendant's complaint as to the use of the transcript of testimony given by Mrs. Fuhrmeister at a prior trial. This is a retrial of the same cause after a mistrial had been declared. Foundation evidence for use of the transcript shows the witness was suffering from terminal cancer at the date of the second trial and was physically unable to testify. The transcript was admissible. Section 622.97, Code, 1971; cf. State v. Washington, 160 N.W.2d 337 (1968); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

V. We have noted People v. Jourdan, 14 Mich.App. 743, 165 N.W.2d 890 (1968), cited in support of defendant's contention that defendant should have been affirmatively informed the questioning would stop at his request. The holding was shortly termed "mere dicta" by the same court and abandoned. People v. Tubbs, 22 Mich. App. 549, 177 N.W.2d 622 (1970); People v. Pantoja, 28 Mich.App. 681, 184 N.W.2d 762 (1971).

We have carefully examined the exhibits, the record and so much of the transcript as was not included in the record, and considered numerous cases bearing on the errors assigned. We find no reversible error.

Affirmed.

All Justices concur, except UHLENHOPP, J., and MOORE, C. J., who concur in the result, and REES, J., who takes no part.

UHLENHOPP, Justice (concurring in result).

I concur in the result and in the opinion except for the statement in division II, "We need not consider the efficacy of the rule eliminating the third element mentioned by McCormick." Our long-standing rule, which is sound, is that the only additional evidence which is required, when a confession is admitted, is proof that the offense was committed. The statute so provides. Code, 1971, § 782.7. See State v. Leedom, 247 Iowa 911, 76 N.W.2d 773.